# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

PEOPLE v JENNINGS

Docket No. 165764. Argued April 22, 2026 (Calendar No. 1). Decided July 24, 2026.

Devante K. Jennings was convicted, following a jury trial in the Macomb Circuit Court, of carrying a concealed weapon, MCL 750.227. Defendant was driving a vehicle when it was stopped by the police based on a witness's description of a vehicle that had been involved in a shooting. Officers found a loaded handgun in the glovebox of the vehicle. During a police interview, defendant admitted that he was the driver of the car and had been at the location of the shooting. When a detective asked defendant for permission to obtain a DNA sample to determine whether it matched DNA found on the handgun, defendant refused and ended the interview. At trial, the prosecutor stated during closing argument that ending the interview was evidence of defendant's "guilty conscience" and showed the jury a board with "guilty conscience" written on it. The prosecutor also highlighted that the other occupants of the vehicle when it was stopped had agreed to speak with the police and had not ended their interviews prematurely. After the trial court, Michael E. Servitto, J., expressed concern that the prosecutor had weaponized defendant's invocation of his right to remain silent, defense counsel moved for a mistrial, which the court granted. Defendant further argued that retrial was barred by double-jeopardy principles, but the trial court, noting that defendant had not raised any objections, ruled that a second trial would not violate defendant's double-jeopardy rights because the prosecutor had not specifically intended to provoke defendant into moving for a mistrial. Defendant was convicted following his second trial.

On appeal, the Court of Appeals, RICK, P.J., and LETICA, J. (SHAPIRO, J., dissenting), affirmed in a split, unpublished opinion, issued April 20, 2023 (Docket No. 359837), holding that retrial was not barred under *Oregon v Kennedy*, 456 US 667 (1982), because the record indicated that the prosecutor's error was the result of recklessness, negligence, or a lack of skill rather than an intentional effort to goad the defense into requesting a mistrial. Judge SHAPIRO would have determined that retrial was barred under *Kennedy*, but he also urged the Michigan Supreme Court to adopt the standard set forth by the Arizona Supreme Court in *Pool v Superior Court*, 139 Ariz 98, 108 (1984), because it was easier to apply than *Kennedy*'s subjective standard and was a more appropriate means of protecting the right against double jeopardy and deterring prosecutorial misconduct. Defendant sought leave to appeal in the Michigan Supreme Court, and the Court ordered oral argument on the application, 513 Mich 977 (2024). Following oral argument, the Court granted leave to appeal. ___ Mich ___; 19 NW3d 329 (2025).

In an opinion by Chief Justice CAVANAGH, joined by Justices WELCH, BOLDEN, THOMAS, and HOOD, the Supreme Court *held*:

The standard announced by the United States Supreme Court in *Kennedy* for determining when double-jeopardy principles bar retrial on the basis of prosecutorial misconduct conflicts with the double-jeopardy protections guaranteed by Const 1963, art 1, § 15. *Kennedy* is therefore rejected under state law, and the test set forth in *Pool*, 139 Ariz at 108, is adopted. Under this standard, retrial is barred when (1) mistrial is granted because of improper conduct or actions by the prosecutor; and (2) such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which the prosecutor pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and (3) the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

1. The federal standard from *Kennedy*, under which a mistrial declared due to prosecutorial misconduct bars retrial only if the prosecution intended to goad the defense into moving for one, fails to reflect the intent of the ratifiers of the 1963 Constitution, and that standard is rejected under Article 1, § 15; instead, the *Pool* test from the Arizona Supreme Court is adopted because it better effectuates the double-jeopardy protections guaranteed by Article 1, § 15 and this Court's pre-*Kennedy* pronouncements on this issue.

Both Const 1963, art 1, § 15 and the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution have been construed as prohibiting successive prosecutions and multiple punishments for the same offense. At issue here is the protection against successive prosecutions. This prohibition is not absolute, and two general rules have emerged relating to the permissibility of a retrial after a mistrial is declared. When a mistrial is declared over the defendant's objection, retrial is usually barred unless the mistrial is occasioned by "manifest necessity." When the defense seeks and secures a mistrial, as here, retrial is typically permitted if the mistrial was caused by the innocent conduct of the prosecutor or trial judge, by factors beyond their control, or by defense counsel. But where the mistrial was precipitated by certain types of prosecutorial misconduct, retrial may be barred. Under *Kennedy*, federal double-jeopardy protections bar retrial only when prosecutorial conduct giving rise to a successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial. Justice Stevens, joined by three other justices, wrote separately in *Kennedy* to argue that the Court's narrow standard conflicted with longstanding double-jeopardy rationales. *Kennedy* has also been criticized by several state high courts as unduly narrow and not fully protective of the rights that the Double Jeopardy Clause was intended to safeguard. In *Pool*, for instance, the Arizona Supreme Court agreed with Justice Stevens that the narrow *Kennedy* standard calls for a subjective inquiry that is too difficult to determine and clashes with the United States Supreme Court's own double-jeopardy jurisprudence. The Arizona Supreme Court set forth a three-part test in *Pool* that must be met for double jeopardy to bar retrial when a mistrial has been granted because of the prosecutor's improper conduct.

Although there is no general presumption that federal interpretations of federal law control state interpretations of state law, the history and circumstances surrounding the adoption of Article 1, § 15 indicate an intertwined relationship between the historic interpretations of the Fifth

Amendment and Article 1, § 15 because the ratifiers looked to then-existing federal principles in crafting this part of the 1963 Constitution. Therefore, when federal double-jeopardy jurisprudence offered a clear standard *at or before* the time that Article 1, § 15 was ratified, this Court presumes that the ratifiers intended for that standard to apply under the Michigan Constitution. But federal interpretations first announced *after* ratification carry no such presumption because the ratifiers could not have spoken to a rule that did not yet exist. Accordingly, whether federal jurisprudence accurately reflects the meaning of Article 1, § 15 or other state constitutional provisions is a case-by-case inquiry that hinges on the history of the precise legal doctrine in question. Mechanically adopting the *Kennedy* rule, which was announced for the first time 20 years *after* Article 1, § 15 was ratified, would breach this Court's duty to determine the law made by the people in ratifying Michigan's 1963 Constitution.

2. Under Article 1, § 15, retrial is barred when the elements articulated in *Pool* are satisfied. Because *Kennedy* does not govern by default, the more nuanced issue presented in this case is when improper prosecutorial conduct bars retrial under Article 1, § 15. Neither the plain text of Article 1, § 15 nor pre-1963 precedent directly addresses the precise issue at hand. But by 1963, well-established double-jeopardy principles protected defendants from the declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict, as well as from harassment by successive prosecutions. These principles also safeguarded a defendant's valued right to have his trial completed by a particular tribunal that may be favorably disposed to his fate. As recognized in *Kennedy*, a defendant's valued right to complete their trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances. But the protections guaranteed by Article 1, § 15 are similarly diluted when, e.g., a mistrial is declared after the prosecutor intentionally engages in egregious misconduct to avoid an acquittal or harass the defendant rather than to goad the defendant into moving for a mistrial. Double-jeopardy protections should apply the same way in that scenario as they do in goading cases.

Therefore, because the unduly rigid *Kennedy* standard conflicts with longstanding principles of double-jeopardy law and fails to fully realize the protections ensured by Article 1, § 15, *Kennedy* is rejected under state law. Instead, *Pool* is adopted as more in line with both longstanding double-jeopardy principles incorporated into our state Constitution and Michigan's pre-*Kennedy* caselaw on this subject, which recognized a similar, broader standard. But a defendant still bears a heavy burden to bar retrial under this standard, and only intentional misconduct that necessitates a mistrial opens the door to barring retrial. Consequently, this holding should not be read to suggest that all instances of prosecutorial error or misconduct implicate the protections guaranteed by Article 1, § 15.

Court of Appeals judgment vacated; case remanded to the trial court.

Justice ZAHRA, joined by Justice BERNSTEIN, dissenting, concluded that the majority acted without judicial restraint by overruling this Court's adoption of the *Kennedy* standard in *People v Dawson*, 431 Mich 234, 236 (1988), and by arbitrarily adopting the *Pool* standard. Moreover, this case was not a proper vehicle for adopting a new standard because neither the *Kennedy* test nor the *Pool* test was satisfied. This Court determined in *People v Nutt*, 469 Mich 565, 591 (2004), that the ratifiers of our Constitution intended that Article 1, § 15 was to be construed consistently

with its federal counterpart, and the Court has since affirmed this position in other cases. Further, this Court has also held that there is no basis in the language of Article 1, § 15 to conclude that it offers greater protection than the Fifth Amendment. In adopting the *Pool* standard, the majority incorrectly dispensed with the "compelling reason" test, which provides that the Court should consider whether, e.g., a significant textual difference, longstanding Michigan precedent, or historical factors support interpreting a Michigan constitutional provision more broadly than a parallel provision in the federal Constitution. Here, none of these considerations supported treating the state and federal provisions differently. Justice ZAHRA also noted that the Arizona Supreme Court was not bound by the intent of the ratifiers of the Michigan Constitution, so adopting its standard from *Pool* did not effectuate the intent of the ratifiers of Michigan's Constitution. Moreover, Arizona's double-jeopardy jurisprudence is very different from Michigan's double-jeopardy jurisprudence, and in rejecting the *Kennedy* standard, the Arizona Supreme Court, unlike the Michigan Supreme Court, was not bound by decades of precedent holding that its state double jeopardy clause was to be interpreted consistently with the federal Double Jeopardy Clause.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED  July 24, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                                                      No. 165764

DEVANTE KYRAN JENNINGS,

       Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, C.J.

When a criminal defendant successfully moves for a mistrial based on prosecutorial misconduct, federal double-jeopardy protections bar retrial only when the "conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v Kennedy*, 456 US 667, 679; 102 S Ct 2083; 72 L Ed 2d 416 (1982). This case calls on us to consider whether the narrow standard first announced in *Kennedy* properly effectuates the double-jeopardy protections guaranteed by Article 1,

§ 15, of Michigan's 1963 Constitution. Through independent interpretation of our state Constitution, we hold that it does not. We therefore reject *Kennedy* under Michigan law. We further conclude that the standard set forth in *Pool v Superior Court*, 139 Ariz 98, 108; 677 P2d 261 (1984), better reflects the intent of those who ratified Article 1, § 15. Accordingly, we adopt that standard under Article 1, § 15, vacate the judgment of the Court of Appeals, and remand this case to the trial court for reconsideration of defendant's double-jeopardy arguments.

## I. FACTUAL AND PROCEDURAL HISTORY
### A. FACTS UNDERLYING THE CRIME

In the predawn hours of April 30, 2019, defendant was involved in an incident in which a firearm was discharged outside of a Clinton Township apartment building. After someone fired a handgun several times into the air, three individuals—including the shooter—left the scene in a white Dodge Charger. Defendant, who was driving the car, was stopped by police after a witness reported the incident and provided a vehicle description. Officers searched the car and discovered a loaded handgun with an obliterated serial number in the glovebox. The ammunition in the gun matched the spent shell casings recovered outside the apartment. None of the occupants of the car had a concealed pistol license, nor was the gun registered to any of them.

Later that day, Clinton Township Police Detective Carl Simon interviewed defendant about the incident. Defendant made several admissions during this interview, including that he was at the apartment building, that there was a disturbance there, and that he was the driver of the car, which was registered in his and his father's name. But when Detective Simon asked defendant for permission to obtain a DNA swab to determine

whether it matched the DNA found on the recovered handgun, defendant declined and ended the interview, thereby exercising his right to silence.

## B. TRIAL COURT PROCEEDINGS

Based on these facts, defendant was charged with carrying a concealed weapon (CCW) in a motor vehicle contrary to MCL 750.227.[1]  His first trial took place in November 2019.  During that trial, the prosecutor asked Detective Simon how the interview with defendant ended.  Simon testified that it ended because defendant "did not wish to speak to us anymore."  The prosecutor then asked Detective Simon about the interviews with the other occupants of defendant's vehicle.  Detective Simon explained that they had agreed to speak to the police, had provided full statements, and had not ended the interviews prematurely.  He added that the police never obtained an elimination sample of defendant's DNA because defendant had "abruptly ended" the interview.  Defense counsel did not object to this testimony.

The prosecutor returned to the topic of defendant's interview during closing arguments.  Specifically, the prosecutor stated that defendant had "agreed to waive his [*Miranda*] rights, he said he understood everything, . . . but low and behold [sic], after answering a few questions he says, no, I don't want to talk anymore."  The prosecutor cited

---

[1] The prosecution also charged defendant with altering marks of identity on a firearm, MCL 750.230.  After the close of proofs at defendant's first trial, the prosecutor requested a jury instruction on this charge that included a presumption that the person in possession of a weapon with an altered identification mark was the individual who altered the weapon. The trial court rejected this presumption because it did not "work with the People's burden."  The prosecution dismissed this charge after defendant's first trial.

3

this fact as evidence of defendant's "guilty conscience" and went on to hypothesize defendant's reasoning for terminating the interview:

> [L]ike, well, okay, if I start going down this road further I am going to get into some territory that's not good for me. I am going to start making admissions that I know are going to push me in further trouble. Maybe if I keep my mouth shut at this point, I can kind of walk out of this.

The record also reflects that the prosecutor included the words "guilty conscience" on a board shown to the jury. Again, defense counsel did not object to the prosecutor's argument.

After closing arguments concluded and the jury was excused for deliberation, the trial court instructed the prosecutor and defense counsel to remain in the courtroom to discuss a "concern." That "concern" stemmed from the prosecutor's argument regarding defendant's invocation of his right to remain silent. The trial court explained that the prosecutor had "essentially weaponized" defendant's invocation "as consciousness of guilt" and the court concluded that it was "potentially prosecutorial misconduct."

In response, defense counsel requested a mistrial. After the parties were allowed to briefly research the issue, the prosecutor sought a curative instruction that would explain how defendant had a right to remain silent, that defendant's invocation of that right cannot be used against him, and that "[a]ny evidence [sic] in this regard is stricken from the record." The trial court asked the prosecutor if he was conceding error, to which the prosecutor answered in the affirmative. The trial court then explained that a prosecutor cannot comment on a defendant's invocation of his right to remain silent after he has been accused or brought into custody and arrested. Because "[t]here's no unringing this bell,"

4

the trial court rejected the prosecutor's proposed remedy and granted defendant's motion for a mistrial.

That same day, the parties reappeared before the trial court to discuss scheduling a second trial. Defense counsel argued that retrial was barred on double-jeopardy grounds. The trial court, however, agreed with the prosecutor that a second trial would not violate defendant's double-jeopardy rights because the record lacked evidence that the prosecutor specifically intended to provoke defendant into moving for a mistrial. The trial court also cited defense counsel's lack of objections, adding that "I'm not even sure that we would have a mistrial motion brought before this Court if this Court did not highlight the fact that the prosecution had overstepped their bounds." Accordingly, the trial court denied defendant's request to bar retrial.

Defendant's second trial followed in February 2020. Although the prosecution called the same witnesses at the second trial, its theory of the case was somewhat different. At the first trial, the prosecution posited that defendant may have been the person who shot the gun, although there were some discrepancies between the descriptions of the shooter's clothing and the clothes defendant was wearing when he was stopped by the police. At the second trial, the prosecution proceeded on an aiding-and-abetting theory and argued that defendant was not the person who shot the gun. At the end of this trial, a jury convicted him of CCW. The trial court subsequently sentenced defendant to serve one to five years in prison.

## C. APPELLATE PROCEEDINGS

Defendant appealed his conviction, and the Court of Appeals affirmed in a split decision. *People v Jennings*, unpublished per curiam opinion of the Court of Appeals, issued April 20, 2023 (Docket No. 359837). Relevant here, the majority rejected defendant's argument that double-jeopardy principles barred his retrial. *Id*. at 4. Applying the rule from *Kennedy*—that retrial is impermissible only when the prosecutor intended to goad the defense into moving for a mistrial—the majority first observed that "the prosecutor did not concede that he intended to cause a mistrial." *Id*. The prosecutor instead explained that his goal was to convict defendant. *Id*. Moreover, the majority reasoned that "the record indicates that the prosecutor's error was the result of recklessness, negligence, or a lack of skill rather than an intentional effort to goad the defense into requesting a mistrial in this relatively straight-forward case." *Id*. Consequently, the majority held that defendant's double-jeopardy rights were not violated when he was retried. *Id*.

Judge SHAPIRO dissented. He would have held that, even under the stringent *Kennedy* standard, double-jeopardy principles barred defendant's retrial because the "prosecutor's questions and closing argument were not minor foot faults." *Id*. (SHAPIRO, J., dissenting) at 3. Indeed, the errors were serious enough for the trial court "to sua sponte raise the question of a mistrial." *Id*. On these facts, Judge SHAPIRO concluded that "there was an intent to cause a mistrial, or at minimum to take the very substantial risk that one would be granted in order to introduce prejudicial and unconstitutional evidence." *Id*.

Judge SHAPIRO added that the test under the Michigan Constitution should differ from the one announced in *Kennedy*. See *id*. at 1, 4. In his view, establishing "that a prosecutor specifically intended to cause a mistrial insufficiently protects the principles of

6

double jeopardy because absent an admission of such . . . , it is virtually impossible to determine what the prosecutor's subjective intent was." *Id*. at 4. Judge SHAPIRO thus turned to the test set forth by the Arizona Supreme Court in *Pool*, 139 Ariz 98, which "chang[es] the standard from specific intent to cause a mistrial to 'intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal[.]' " *Id*., quoting *People v Dawson*, 154 Mich App 260, 272; 397 NW2d 277 (1986); see also *Pool*, 139 Ariz at 108-109. Because he found the *Pool* standard to be "both easier to apply than *Kennedy*'s subjective standard and a more appropriate means of protecting the right against double jeopardy and deterring prosecutorial misconduct," Judge SHAPIRO would have adopted it under the Michigan Constitution. *Jennings* (SHAPIRO, J., dissenting), unpub op at 1.[2]

Defendant next sought leave to appeal in this Court. We first ordered oral argument on the application, directing the parties to address

> whether the Double Jeopardy Clauses of the United States Constitution, US Const, Am V, XIV, and the Michigan Constitution, Const 1963, art 1, § 15, barred the defendant's retrial. The parties shall specifically address: (1) what standard the Court should apply to determine whether prosecutorial misconduct bars retrial under Michigan's Double Jeopardy Clause, see, e.g., [*Kennedy*, 456 US at 676]; *Pool*[, 139 Ariz at 108-109]; *State v McClaugherty*, 144 NM 483, 491[; 2008-NMSC-044; 188 P3d 1234] (2008); *Commonwealth v Smith*, 532 Pa 177, 186[; 615 A2d 321] (1992); *People v Batts*, 30 Cal 4th 660, 695-696[; 68 P3d 357] (2003); *State v Rogan*, 91

---

[2] The majority rejected the dissent's invitation to adopt a different standard as to when double jeopardy bars retrial in this context because, in the majority's opinion, "there is little evidence to support the conclusion that defendant could meet" either of the proffered tests. *Jennings*, unpub op at 4 n 2.

Hawai'i 405, 423-424[; 984 P2d 1231] (1999); and (2) whether retrial was impermissible in this case. [*People v Jennings*, 513 Mich 977, 977 (2024).]

After hearing oral argument on the application, we granted leave to appeal. Our order directed the parties to address the following additional issues:

> (1) whether there is a "compelling reason" under the Michigan Constitution to adopt a different test from the one set forth in [*Kennedy*, 456 US at 675-676], to determine whether prosecutorial misconduct bars retrial, see *People v Bullock*, 440 Mich 15, 28-35[; 485 NW2d 866] (1992); but see *People v Nutt*, 469 Mich 565, 590[; 677 NW2d 1] (2004); (2) if so, whether this Court should adopt a test from another state or develop factors that expound on the "bad faith" test previously adopted in Michigan, see *United States v Dinitz*, 424 US 600, 611[; 96 S Ct 1075; 47 L Ed 2d 267] (1976); *People v Anderson*, 409 Mich 474, 485[; 295 NW2d 482] (1980); *Pool*[, 139 Ariz at 108-109]; and *People v Tyson*, 423 Mich 357, 371-372[; 377 NW2d 738] (1985); and (3) whether retrial was permissible in this case. [*People v Jennings*, ___ Mich ___, ___; 19 NW3d 329, 329-330 (2025).]

## II. STANDARD OF REVIEW AND GENERAL PRINCIPLES OF CONSTITUTIONAL INTERPRETATION

We review de novo questions of state constitutional interpretation. *People v Parks*, 510 Mich 225, 245; 987 NW2d 161 (2022). This Court is "the ultimate authority with regard to the meaning and application of Michigan law." *Bullock*, 440 Mich at 27. Similarly, a "double-jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *Nutt*, 469 Mich at 573.

When interpreting the Michigan Constitution, our "primary objective" is to "determine the text's original meaning to the ratifiers, the people, at the time of ratification." *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). We thus aim to "realize the intent of the people by whom and for whom the constitution was ratified." *Studier v Mich Pub Sch Employees Retirement Bd*, 472 Mich 642, 652; 698 NW2d 350 (2005) (quotation marks and citation omitted). We must also consider "the

8

circumstances leading to the adoption of the provision and the purpose sought to be accomplished." *People v Nash*, 418 Mich 196, 209; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.) (citation omitted).  At bottom, because a "constitution is made for the people and by the people," the "interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61; 921 NW2d 247 (2018) (quotation marks and citation omitted).

## III.  ANALYSIS

This case concerns the scope of double-jeopardy protections afforded by Article 1, § 15, of Michigan's 1963 Constitution.  In particular, we must determine the circumstances under which retrial is barred when a mistrial is declared based on improper prosecutorial conduct.  Before turning to the question of whether the Michigan Constitution affords greater protection than its federal analogue in this realm, we first outline fundamental double-jeopardy principles that guide our analysis.  We then turn to the different lines of cases applying these principles to circumstances similar to those presented in this case.  Finally, because we conclude that the federal standard debuted in *Kennedy*, 456 US 667, fails to reflect the intent of those who ratified Michigan's 1963 Constitution two decades earlier, we reject that standard under Article 1, § 15.  We instead adopt the test set forth by the Arizona Supreme Court in *Pool*, 139 Ariz 98,[3] as that test better effectuates the double-

---

[3] As explained in more detail below, the *Pool* test was first adopted by our Court of Appeals in *Dawson*, 154 Mich App at 272.  On appeal before this Court, the prosecution in that case conceded error under the federal standard at oral argument, so we declined to determine if we should incorporate the test articulated in *Pool* under our state Constitution.  *People v Dawson*, 431 Mich 234, 251; 427 NW2d 886 (1988).

9

jeopardy protections guaranteed by Article 1, § 15 and our pre-*Kennedy* pronouncements on this issue.

## A. DOUBLE-JEOPARDY BACKGROUND

Broadly speaking, both the Michigan and United States Constitutions protect against being twice placed in jeopardy for the same offense. Const 1963, art 1, § 15; US Const, Am V. Article 1, § 15, of Michigan's 1963 Constitution provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy," while the Fifth Amendment to the United States Constitution similarly states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]"[4] We have recognized that the ratifiers of Michigan's 1963 Constitution intended to incorporate contemporaneous common-law and federal double-jeopardy principles into Article 1, § 15. *Nutt*, 469 Mich at 575, 591.

Against this backdrop, Article 1, § 15 and the Fifth Amendment have been construed as prohibiting both successive prosecutions and multiple punishments for the same offense. *Id*. at 575 & n 11. At issue in this case is the protection against successive prosecutions. The "principal thrust" of double-jeopardy protection under "our federal and state constitutional provision[s] is protection from repeated prosecutions for the same criminal offense arising out of the same conduct." *People v Harding*, 443 Mich 693, 705; 506 NW2d 482 (1993). This venerable safeguard is "deeply ingrained in at least the Anglo-

---

[4] The Double Jeopardy Clause of the Fifth Amendment was made applicable to the states in *Benton v Maryland*, 395 US 784, 787; 89 S Ct 2056; 23 L Ed 2d 707 (1969).

10

American system of jurisprudence." *Green v United States*, 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957). One primary rationale underlying the protection is that

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. [*Id.*[5]]

Put another way, the prohibition on successive prosecutions ensures that the state cannot "repeatedly prosecute persons for the same crime, transforming the trial process itself into a punishment and effectively punishing the accused without his having been adjudged guilty of an offense meriting punishment." *People v Dawson*, 431 Mich 234, 250; 327 NW2d 886 (1988).

The protection against successive prosecutions has also been described as insulating a "defendant's valued right to have his trial completed by a particular tribunal . . . ." *Wade v Hunter*, 336 US 684, 689; 69 S Ct 834; 93 L Ed 974 (1949). This right furthers the defendant's interest of "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v Jorn*, 400 US 470, 486; 91 S Ct 547; 27 L Ed 2d 543 (1971).

The bar on successive prosecutions also serves as a check on state-sanctioned gamesmanship. As the United States Supreme Court has explained, "Implicit in this is the thought that if the Government may reprosecute, it gains an advantage from what it learns

---

[5] We have several times endorsed *Green*'s articulation of the purposes of constitutional double-jeopardy protections. See, e.g., *Nutt*, 469 Mich at 575 n 10; *People v Herron*, 464 Mich 593, 601; 628 NW2d 528 (2001); *Dawson*, 431 Mich at 251; *Anderson*, 409 Mich at 483 n 15.

11

at the first trial about the strengths of the defense case and the weaknesses of its own." *United States v DiFrancesco*, 449 US 117, 128; 101 S Ct 426; 66 L Ed 2d 328 (1980). So double-jeopardy protections "forbid[] a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v United States*, 437 US 1, 11; 98 S Ct 2141; 57 L Ed 2d 1 (1978). See also *Anderson*, 409 Mich at 483 n 15.

For these reasons, the general rule is that a prosecutor is entitled "to one, and only one, opportunity to require an accused to stand trial." *Arizona v Washington*, 434 US 497, 505; 98 S Ct 824; 54 L Ed 2d 717 (1978). And because jeopardy usually attaches once the jury is "selected and sworn,"[6] this constitutional guarantee advances "an accused's interest in avoiding multiple prosecutions even where no determination of guilt or innocence has been made." *People v Lett*, 466 Mich 206, 215; 644 NW2d 743 (2002). In other words, double-jeopardy protections kick in at the beginning of trial, not at the end after the jury returns its verdict. *Dawson*, 431 Mich at 251 ("An accused is placed in jeopardy as soon as the jury is selected and sworn. Hence, double jeopardy protection attaches before the conclusion of the trial.").[7]

---

[6] Or, in a bench trial, "once the court begins to hear evidence." See, e.g., *People v Hicks*, 447 Mich 819, 826-827; 528 NW2d 136 (1994) (opinion by GRIFFIN, J.).

[7] This general proposition appears to have also been the understanding of delegates to the 1961 Constitutional Convention, who drafted Michigan's 1963 Constitution. See, e.g., 1 Official Record, Constitutional Convention 1961, p 541 (indicating that one delegate explained that "it is not necessary that a trial be completed on its merits in order to put the defendant in jeopardy" because, "[a]s has been stated by Delegate Stevens, he is in jeopardy the minute a jury has been empaneled . . .").

In light of the protections against double jeopardy, "[r]etrials are an exception to the general double jeopardy bar," not the norm. *Id*. at 257. Yet, like many general rules of constitutional law, the prohibition on successive prosecutions is not an absolute one. For example, it does not "mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." *Wade*, 336 US at 688. Instead, a criminal defendant's rights must be balanced against society's interest in "punishing one whose guilt is clear." *United States v Tateo*, 377 US 463, 466; 84 S Ct 1587; 12 L Ed 2d 448 (1964). See also *Lett*, 466 Mich at 215. This is because it "would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *Tateo*, 377 US at 466. Two general rules have thus emerged relating to the permissibility of retrial after a mistrial is declared.

First, when a mistrial is declared over the defendant's objection (often at the request of the prosecutor), retrial is usually barred unless "the mistrial is occasioned by 'manifest necessity.'" *Lett*, 466 Mich at 215 (citations omitted).[8] The most common type of

---

[8] We have adopted Justice Story's "classic formulation" of the "manifest necessity" standard:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . ." [*People v Hicks*, 447 Mich 819, 828; 528 NW2d 136 (1994) (opinion by GRIFFIN, J.), quoting *United States v Perez*, 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824).]

13

"manifest necessity" is a deadlocked jury. See *People v Thompson*, 424 Mich 118, 128; 379 NW2d 49 (1985). But because of the possibility that the state may pursue a mistrial for its own advantage, the prosecutor bears the " 'heavy' burden" of establishing "manifest necessity." See *People v Beck*, 510 Mich 1, 12; 987 NW2d 1 (2022), quoting *Washington*, 434 US at 505.

The second rule applies when, as here, the *defense* seeks and secures a mistrial. "Where the motion for mistrial was made by defense counsel, or with his consent, and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by defense counsel himself," retrial is typically permitted. *Dawson*, 431 Mich at 253. The premise of this rule is that the defendant himself has elected to terminate the first trial, arguably waiving any double-jeopardy claim. See *id*. at 254. But where "the successful mistrial motion is precipitated by" certain types of improper prosecutorial conduct, retrial may still be barred. *Tyson*, 423 Mich at 370. Otherwise, if the case were going poorly for the state, the prosecution could force the defendant's hand into moving for a mistrial—thereby dodging the heavy burden of establishing a "manifest necessity" for retrial and creating an unfair opportunity to refine its trial strategy—and simply retry the defendant anew.

Courts have, however, struggled to define the precise level of prosecutorial misconduct required to trigger the double-jeopardy bar and to apply that standard to the facts of individual cases. *Id*. As a result, various standards have emerged across the federal and state court systems. *Id*. That is where we turn next.

14

## B. LEADING FEDERAL AND STATE AUTHORITIES REGARDING RETRIAL AFTER A MISTRIAL BASED ON IMPROPER PROSECUTORIAL CONDUCT

Currently, under federal law, the rule from *Kennedy* is that a mistrial declared due to prosecutorial misconduct bars retrial only if the prosecution intended to goad the defense into moving for one. *Kennedy*, 456 US at 679. To determine whether the federal *Kennedy* standard properly effectuates double-jeopardy protections under the Michigan Constitution, we first outline pre-*Kennedy* caselaw, the *Kennedy* standard itself, and post-*Kennedy* departures by our sister state courts.

### 1. PERTINENT PRE-*KENNEDY* CASELAW

In the latter half of the twentieth century, the United States Supreme Court began recognizing for the first time that double-jeopardy principles may sometimes bar retrial after the defense secures a mistrial predicated upon prosecutorial misconduct. For instance, in *Tateo*, 377 US at 468 n 3, the Court noted that "[i]f there were any intimation in a case that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused," retrial may be barred. Similarly, in *Jorn*, 400 US at 485, the Court explained that while "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution," this is so only "where circumstances develop not attributable to prosecutorial or judicial overreaching[.]" The Court also referenced "bad-faith conduct by judge or prosecutor," *id*., adding that "where a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred," *id*. at 485 n 12.

Expanding on these pronouncements, the Court in *Dinitz*, 424 US at 611, explained that the "Double Jeopardy Clause does protect a defendant against governmental actions

15

intended to provoke mistrial requests . . . ." But it also reaffirmed the broader language from *Jorn*, noting that retrial is similarly prohibited "where 'bad-faith conduct by judge or prosecutor' . . . threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Id*., quoting *Jorn*, 400 US at 485, and *Downum v United States*, 372 US 734, 736; 83 S Ct 1033; 10 L Ed 2d 100 (1963) (brackets in *Dinitz*). "In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions." *Dinitz*, 424 US at 608. The *Dinitz* Court thus concluded that retrial is permissible absent bad-faith conduct committed "in order to goad the respondent into requesting a mistrial *or* to prejudice his prospects for an acquittal." *Id*. at 611 (emphasis added). See also *Lee v United States*, 432 US 23, 33-34; 97 S Ct 2141; 53 L Ed 2d 80 (1977) ("It follows under *Dinitz* that there was no double jeopardy barrier to petitioner's retrial unless the judicial or prosecutorial error that prompted petitioner's motion was 'intended to provoke' the motion or was otherwise 'motivated by bad faith or undertaken to harass or prejudice' petitioner."), quoting *Dinitz*, 424 US at 611.

In the wake of these cases, this Court recognized a similar standard based on prosecutorial bad faith and overreaching. Relying on *Jorn* and *Lee*, we declared that retrial is barred "when the defendant's motion is induced by bad-faith conduct of the prosecutor or judge." *Anderson*, 409 Mich at 485. Likewise, in *People v Benton*, 402 Mich 47, 63; 260 NW2d 77 (1977) (opinion by LEVIN, J.), we explained how the Court in *Dinitz* "observed a distinction between *sua sponte* mistrials and mistrials granted at the defendant's request, declaring that where the defendant requests the mistrial, retrials may

16

be barred when the judge or prosecutor acted in bad faith."  See also *People v Johnson*, 396 Mich 424, 434 n 9; 240 NW2d 729 (1976).  Before *Kennedy*, then, both this Court and the United States Supreme Court recognized that double-jeopardy principles may bar retrial after a mistrial stemming from bad-faith conduct *or* overreaching by the prosecutor—even absent a specific intent to goad the defense into moving for a mistrial.[9]  See *Tyson*, 423 Mich at 372-373.

## 2.  THE *KENNEDY* SEA CHANGE

The legal landscape relating to retrial after a defense-obtained mistrial changed significantly in 1982 when the United States Supreme Court issued its landmark decision in *Kennedy*, 456 US 667.  In *Kennedy*, the defendant stood trial on theft charges.  *Id*. at 669.  During the defendant's first trial, the prosecutor asked a witness whether the defendant was "a crook."  *Id*.  The defendant then moved for a mistrial, which the trial court granted.  *Id*.  After the prosecution sought to retry the defendant, the defendant moved to dismiss the case, citing double jeopardy.  *Id*.  The trial court found that the prosecutor did not intend to cause a mistrial and denied the defendant's motion on that basis.  *Id*.  At his second trial, the defendant was convicted.  *Id*. at 670.

The defendant appealed his conviction on double-jeopardy grounds.  *Id*.  The Oregon Court of Appeals held that retrial was barred because, although the prosecutor did not intend to provoke a mistrial, the prosecutor still engaged in impermissible " 'overreaching.' "  *Id*.  That is, the personal attack from the prosecutor left the defendant

---

[9] Importantly, we never overturned our line of cases incorporating the *Jorn* and *Lee* standard.

17

"with a 'Hobson's choice—either to accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time.' " *Id*., quoting *State v Kennedy*, 49 Or App 415, 418; 619 P2d 948 (1980).

In a fractured opinion, the United States Supreme Court reversed, holding that retrial is barred only when a prosecutor specifically intends to goad the defense into moving for a mistrial. *Kennedy*, 456 US at 679. The Court first acknowledged that a "defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances." *Id*. at 673. The Court then rejected the broader tests of "bad faith" and "harassment" articulated in *Dinitz* because "they offer virtually no standards for their application." *Id*. at 674. More specifically, the Court reasoned that every action taken by the prosecutor during a trial aims to " 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt," so "it will be a rare trial of any complexity in which some proffered evidence by the prosecutor or by the defendant's attorney will not be found objectionable by the trial court." *Id*. at 674-675. The Court also speculated that the "broad and somewhat amorphous" standard applied by the Oregon Court of Appeals would actually hurt criminal defendants because "the judge presiding over the first trial might well be more loath to grant a defendant's motion for mistrial" if the likely consequence is a bar on retrial. *Id*. at 676. Based on these concerns, the Court found that the narrower intent-to-goad standard—"though certainly not entirely free from practical difficulties"—was more "manageable." *Id*. at 675.

Justice Stevens—joined by three other justices—wrote separately. Although he agreed with the Court's ultimate conclusion that double-jeopardy principles did not bar the

18

defendant's retrial, Justice Stevens rejected the new standard articulated by the majority. *Id*. at 681 (Stevens, J., concurring in the judgment). To him, the Court "gratuitously lop[ped] off a portion of the previously recognized exception" in a way that "compromises an important protection provided by the Double Jeopardy Clause." *Id*. After all, it "is almost inconceivable that a defendant could prove that the prosecutor's deliberate misconduct was motivated by an intent to provoke a mistrial instead of an intent simply to prejudice the defendant." *Id*. at 688. Such an untenable standard, Justice Stevens cautioned, would "eviscerate the exception." *Id*.

Moreover, Justice Stevens reasoned that the Court's narrow standard conflicts with longstanding double-jeopardy rationales:

> For example, a prosecutor may be interested in putting the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if he cannot obtain a conviction. In such a case, with the purpose of harassing the defendant the prosecutor may commit repeated prejudicial errors and be indifferent between a mistrial or mistrials and an unsustainable conviction or convictions. [*Id*. at 689 (citations omitted).]

Justice Stevens reasoned that this scenario would fall outside the Court's new standard "because, by hypothesis, the prosecutor's intent is to obtain a conviction, not to provoke a mistrial." *Id*. "Yet the defendant's choice—to continue the tainted proceeding or to abort it and begin anew—can be just as 'hollow' in this situation as when the prosecutor intends to provoke a mistrial." *Id*. (citation omitted). Therefore, in his view, "a court need not divine the exact motivation for the prosecutorial error. It is sufficient that the court is persuaded that egregious prosecutorial misconduct has rendered unmeaningful the defendant's choice to continue or to abort the proceeding." *Id*.

19

Justice Stevens did, however, recognize the limited nature of the standard he articulated. He first explained that, "because the exception is justified by the intolerance of intentional manipulation of the defendant's double jeopardy interests, a finding of deliberate misconduct normally would be a prerequisite to a reprosecution bar." *Id*. at 690. And such deliberate misconduct must generally be inferred through objective evidence; "[t]he more egregious the prosecutorial error, and the harsher its impact on the defendant, the more readily the inference could be drawn." *Id*. at 690 n 29. Next, Justice Stevens contended that

> because the defendant's option to abort the proceeding after prosecutorial misconduct would retain real meaning for the defendant in any case in which the trial was going badly for him, normally a required finding would be that the prosecutorial error virtually eliminated, or at least substantially reduced, the probability of acquittal in a proceeding that was going badly for the government. [*Id*. at 690.]

This consideration would, however, be far less impactful if "the prosecutor's intent is primarily to harass the defendant, and only secondarily to obtain a conviction," because double-jeopardy protections shield "a defendant not only from 'declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' but also from '[h]arassment of an accused by successive prosecutions.'" *Id*. at 690 n 31, quoting *Downum*, 372 US at 736 (brackets in *Kennedy*). All in all, Justice Stevens concluded that, even under his broader standard, "only in a rare and compelling case will a mistrial declared at the request of the defendant or with his consent bar a retrial." *Kennedy*, 456 US at 690 (Stevens, J., concurring).

Finally, Justice Stevens stressed that the "inexactitude" of the prior standard is a virtue, not a vice. *Id*. at 690-691. "The value of the overreaching standard, like '[t]he value

of the [manifest necessity standard,] . . . lies in [its] capacity for informed application under widely different circumstances without injury to defendants or to the public interest.' " *Id*. at 691, quoting *Wade*, 336 US at 691 (brackets in *Kennedy*). Therefore, Justice Stevens declined to join the Court's opinion "because it totally fails to justify its disavowal of the Court's precedents." *Kennedy*, 456 US at 693 (Stevens, J., concurring).[10]

### 3. POST-*KENNEDY* DEVELOPMENTS

The *Kennedy* decision was met with swift criticism from several state high courts.[11] See, e.g., *Batts*, 30 Cal 4th at 665 (noting that the *Kennedy* standard "has been widely

---

[10] Two other justices also wrote concurring opinions in *Kennedy*. Justice Brennan, joined by Justice Marshall, concurred in the judgment but wrote separately to emphasize that "nothing in the holding of the Court today prevents the state courts, on remand, from concluding that respondent's retrial would violate the provision of the Oregon Constitution that prohibits double jeopardy . . . ." *Id*. at 680 (Brennan, J., concurring in the judgment). Justice Powell—who provided the fifth vote for the majority—also wrote separately to highlight that courts "should rely primarily upon the objective facts and circumstances of the particular case" in determining whether a prosecutor subjectively intended to provoke the defense into moving for a mistrial. *Id*. at 680 (Powell, J., concurring).

[11] To be sure, a majority of states have acquiesced to or adopted the *Kennedy* standard under their respective state constitutions. See Note, *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct: A Call for Broader State Protections*, 122 Colum L Rev 173, 188 & nn 107, 109 (2022) (collecting cases); 6 LaFave et al, Criminal Procedure (5th ed), § 25.2(b), p 1233 n 10 (same). Yet, as one commentator aptly notes, "very few of these courts have explicitly discussed their reasons" for adopting the standard. *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct*, 122 Colum L Rev at 188-189 & n 110. Some courts that have stated that the *Kennedy* standard is consistent with state constitutional law simply reason that their state double-jeopardy provision must be read coterminously with federal interpretations. See, e.g., *State v Bedolla*, 298 Neb 736, 744; 905 NW2d 629 (2018); *City of West Fargo v Ekstrom*, 938 NW2d 915, 919; 2020 ND 37 (2020); *Poretta v Commonwealth*, 409 Mass 763, 767; 569 NE2d 794 (1991). Other courts have provided substantially the same justifications as those outlined in *Kennedy* itself. See, e.g., *State v White*, 322 NC 506, 511; 369 SE2d 813 (1988); *State v Diaz*, 521 A2d 129, 133 (RI, 1987). In any event, determining the proper rule under

21

viewed as unduly narrow and as not fully protective of the interest that the double jeopardy clause was intended to safeguard"); *State v Breit*, 122 NM 655, 661; 1996-NMSC-067; 930 P2d 792 (1996) ("Among some state courts there is distinct discomfort with the *Kennedy* rule."). We now survey some of the leading state decisions that have departed from *Kennedy* under their respective state constitutions.

We begin with the post-remand decision of the Oregon Supreme Court in *Kennedy*. Accepting Justice Brennan's invitation, *Kennedy*, 456 US at 680-681 (Brennan, J., concurring in the judgment), Oregon's high court unanimously rejected the narrow standard announced "for the first time" by the *Kennedy* Court. *State v Kennedy*, 295 Or 260, 269, 276; 666 P2d 1316 (1983). In *Kennedy*'s stead, the Oregon Supreme Court opted to afford greater double-jeopardy protection under an analogous provision of the Oregon Constitution. *Id*.

The Oregon Supreme Court first emphasized that "[s]tate courts cannot abdicate their responsibility for these independent guarantees, at least not unless the people of the state themselves choose to abandon them and entrust their rights entirely to federal law," before turning to the "narrow" issue presented: whether "there is room for a double jeopardy bar beyond the case of an intentionally provoked mistrial when a prosecutor 'harasses' the defendant with what the prosecutor knows to be prejudicial error." *Id*. at 271-272. So framed, the court clarified that "a guarantee against 'harassment,' " which is what double-jeopardy principles provide, "implies a requirement of some conscious choice of prejudicial action before the guarantee bars correction of the error by a new trial." *Id*.

---

our state Constitution is not a mere head-counting exercise but rather a searching inquiry into what the correct standard is under Article 1, § 15.

22

at 273. Thus, the court concluded that negligence on the part of the prosecutor—gross or not—does not bar retrial. *Id*.

On the other side of the coin, the court perceived two central flaws with limiting the standard to intentional provocation of mistrials. *Id*. at 274. First, the *Kennedy* Court's test hinged on *prosecutorial* misconduct. *Id*. Yet this singular focus, to the Oregon high court, overlooks that the conduct of *other* government officials—like bailiffs and judges—may also cause a mistrial. *Id*. at 274-275. Second, "a finding that a prosecutor initially pursued a course of prejudicial misconduct for the purpose of forcing a mistrial is a grave matter." *Id*. at 275. Such a finding can justify disbarment, other disciplinary action, and even a federal civil-rights action. *Id*. So the court did "not think that impermissible double jeopardy for the defendant is limited to the few situations in which a judge is sufficiently convinced of a prosecutor's improper intentions to invoke those penalties" because that "places too heavy a burden on the inference that a defendant must ask a judge to draw from the objective conduct and circumstances." *Id*. at 276. For these reasons, the Oregon Supreme Court departed from *Kennedy* by holding that the Oregon Constitution bars retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal." *Id*.

A unanimous Arizona Supreme Court reached a similar conclusion in *Pool*, 139 Ariz 98. Although that court would typically interpret its state double-jeopardy clause "in conformity to the interpretation given by the United States Supreme Court to the same clause in the federal constitution," the court declined to do so in the context of mistrials resulting from improper prosecutorial conduct. *Id*. at 108. First, Arizona's high court

23

disagreed with the *Kennedy* majority that a broader test would be standardless. *Id*. Rather, siding with Justice Stevens, the court asserted that the narrow *Kennedy* standard calls for "a subjective inquiry" that is "too difficult to determine." *Id*. Second, the court believed that the *Kennedy* standard clashed with the United States Supreme Court's own pronouncements on the purpose of double-jeopardy protections, including the defendant's right to have the first tribunal adjudicate his guilt and ensuring that the state, " 'with all its resources and power,' " cannot subject a defendant to repeated embarrassment, harassment, and anxiety through repeated prosecutions for the same offense. *Id*., quoting *Green*, 355 US at 187-188. Thus, while the *Pool* court acknowledged that "uniformity is desirable" when interpreting the state's double-jeopardy clause alongside the federal provision, it nonetheless diverged from *Kennedy* based on the fundamental principles underlying double-jeopardy protections, as expressed in *Green*. *Pool*, 139 Ariz at 108.[12]

After rejecting *Kennedy*, the Arizona Supreme Court next considered the appropriate test under its state constitution. The court explained that the question "should turn upon the concept of enforcing the constitutional guarantee against double jeopardy when the right to be free from multiple trials . . . would be impaired by the prosecutor's intentional, improper conduct." *Id*. Against this backdrop, the court set forth three conditions that must be met for double jeopardy to bar retrial in this context under the Arizona Constitution:

---

[12] The *Pool* court also noted that the principles of *Green* were followed in pre- and post-*Kennedy* state court decisions. See *State v Rumsey*, 136 Ariz 166, 665; 665 P2d 48 (1983); *Klinefelter v Superior Court*, 108 Ariz 494, 496; 502 P2d 531 (1972).

1. Mistrial is granted because of improper conduct or actions by the prosecutor; and

2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and

3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial. [*Id*. at 108-109.[13]]

"In such a situation, the State has intentionally exposed the defendant to multiple trials for the same crime and has destroyed his expectation of completing the proceeding before the original tribunal." *Id*. at 109. Because this "is exactly what the double jeopardy provision was intended to prevent," the *Pool* court parted ways with *Kennedy*. *Id*.

*Pool* is no stranger to Michigan jurisprudence. For many of the reasons expressed by Justice Stevens and the *Pool* court, our Court of Appeals in *Dawson*, 154 Mich App 260, adopted the *Pool* standard under Article 1, § 15. Yet *Pool*'s tenure as the governing test in Michigan was short-lived. On appeal in this Court, the prosecution in *Dawson* conceded that the trial prosecutor's conduct was improper under the *Kennedy* standard. *Dawson*, 431 Mich at 257. Based on this concession, we applied *Kennedy* and concluded that "there is no need in the instant case to decide whether this Court should go further than

---

[13] The *Pool* court added that prosecutorial intent and knowledge must be determined through "objective factors," including

the situation in which the prosecutor found himself, the evidence of actual knowledge and intent and any other factors which may give rise to an appropriate inference or conclusion. [The trial court] may also consider the prosecutor's own explanations of his 'knowledge' and 'intent' to the extent that such explanation can be given credence in light of the minimum requirements expected of all lawyers. [*Id*. at 108 n 9.]

the federal standard." *Id*. We therefore expressly left open the question of whether a broader standard is appropriate under the Michigan Constitution.[14] See also *Tyson*, 423 Mich at 372 (finding it "unnecessary to decide" whether Michigan should adopt another standard because "the prosecutor's error in this case was insufficient" to satisfy any of them).

In addition to Oregon and Arizona, several other states have also declined to follow *Kennedy*. See 6 LaFave, § 25.2(b), pp 1233-1234 & n 11. Take Nevada, for instance, which adopted the *Pool* test in *Thomas v Eighth Judicial Dist Court in & for Co of Clark*, 133 Nev 468, 475-476; 402 P3d 619 (2017). Pennsylvania, too, has recognized a broader standard. See *Commonwealth v Johnson*, 659 Pa 277, 309; 231 A3d 807 (2020) (holding that, under the Pennsylvania Constitution, "prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result"). The Hawai'i Supreme Court has barred retrial under its state charter when "the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." *Rogan*, 91 Hawai'i at 423. New Mexico's high court has concluded that retrial is impermissible

---

[14] We accordingly disagree with Justice ZAHRA's assertion that this Court in *Dawson* adopted *Kennedy* as the only possible standard under Article 1, § 15, such that adopting any *other* standard would necessitate the overruling of precedent. A complete reading of the opinion reveals that, despite the prosecution's argument that this Court should expressly reject *Pool*, *Dawson* recognized *Kennedy* as the floor, rather than the ceiling, by saving for another day the question of whether a broader standard is warranted under our state Constitution. *Dawson*, 431 Mich at 257. We therefore pick up where *Dawson* left off by considering whether a broader standard is, in fact, warranted under Article 1, § 15.

when improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal. [*Breit*, 122 NM at 666.]

Finally, the California Supreme Court in *Batts*, 30 Cal 4th at 666, held that retrial is barred, first, "when the prosecution intentionally commits misconduct for the purpose of triggering a mistrial"; and second, when "the prosecution, believing (in view of events that occurred during trial) that a defendant is likely to secure an acquittal at that trial, knowingly and intentionally commits misconduct in order to thwart such an acquittal."

Although these post-*Kennedy* standards do not mirror each other in every respect, they all share a common thread: state double-jeopardy protections may still bar retrial in cases of egregious prosecutorial misconduct even if the defendant cannot prove that the prosecutor's specific intent was to provoke a defense mistrial request. See, e.g., *Kennedy*, 295 Or at 273. See also Note, *When Double Jeopardy Should Bar Retrial In Cases of Prosecutorial Misconduct: A Call for Broader State Protections*, 122 Colum L Rev 173, 190 (2022). In so holding, these state courts also recognize that the United States Supreme Court's interpretation of a *federal* constitutional provision does not—and cannot—fix the meaning of a comparable *state* constitutional provision, especially when the United States Supreme Court later "revises its interpretation of the federal counterpart." See, e.g., *Kennedy*, 295 Or at 271.

## C. THE PROPER SCOPE OF MICHIGAN'S DOUBLE-JEOPARDY CLAUSE IN THE CONTEXT OF DEFENSE MISTRIAL REQUESTS

We now turn to the proper test under Article 1, § 15 of the Michigan Constitution. The prosecution contends that *Kennedy* is the correct standard; defendant counters that a

27

broader standard is warranted.  To resolve this dispute, we first clarify the relationship between the state and federal Double Jeopardy Clauses.  We then explain why a standard broader than *Kennedy* is appropriate under Article 1, § 15.

### 1.  INTERPRETING THE MICHIGAN CONSTITUTION IN LIGHT OF A SIMILAR FEDERAL CONSTITUTIONAL PROVISION

When interpreting Article 1 of the Michigan Constitution, the issue often arises of whether to afford broader protections under our state Constitution than those provided by the federal Constitution.[15]  Time and again, this Court has explained that "[i]n interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical." *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004).  Rather, this Court must always "determine what law the people have made," *id*. (quotation marks and citations omitted), and give effect to that law so long as doing so does not "deprive a citizen of a right granted by the federal constitution," *Sitz v Dep't of State Police*, 443 Mich 744, 760; 506 NW2d 209 (1993).  Therefore, while we may not "simply engraft onto" the Michigan Constitution "more 'enlightened' rights than the framers intended," we simultaneously "may not disregard the guarantees that our constitution confers on Michigan citizens merely

---

[15] Appropriately titled the "Declaration of Rights," Article 1 of the Michigan Constitution "guarantees the civil and political integrity . . . [and] the freedom and independence of our citizens[.]"  1 Official Record, Constitutional Convention 1961, p 106 (remarks of Governor John B. Swainson).  It is "the bedrock upon which all else in the constitution may be built."  *Id*.  Accordingly, "[t]he Michigan Declaration of Rights, like the federal Bill of Rights, is 'drawn to restrict governmental conduct and to provide protection from governmental infringement and excesses . . . .' "  *Sitz v Dep't of State Police*, 443 Mich 744, 760; 506 NW2d 209 (1993), quoting *Woodland v Citizens Lobby*, 423 Mich 188, 204; 378 NW2d 337 (1985) (ellipsis in *Sitz*).

28

because the United States Supreme Court has withdrawn or not extended such protection." *Id*. at 759.

Despite these federalism-focused maxims, we have at times suggested "that there is some specific burden on this Court to identify a 'compelling reason' or justification for interpreting the words of the Michigan Constitution differently than the words of the United States Constitution." *People v Tanner*, 496 Mich 199, 222 n 16; 853 NW2d 653 (2014). The "compelling reason" language first appeared in *Nash*, 418 Mich at 214-215 (opinion by BRICKLEY, J.), where we noted that "[w]e have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, *and where there is compelling reason*, we will undoubtedly do so again." (Citation omitted; emphasis added.) Later opinions of this Court seemingly interpreted *Nash* as establishing a hurdle in favor of federal caselaw that must be cleared before interpreting provisions of the Michigan Constitution differently from their federal analogues. See, e.g., *People v Collier*, 426 Mich 23, 39; 393 NW2d 346 (1986); *People v Hill*, 429 Mich 382, 393; 415 NW2d 193 (1987); *People v Collins*, 438 Mich 8, 25-29; 475 NW2d 684 (1991); *Bullock*, 440 Mich at 29-30 & n 10 (questioning the "compelling reason" standard but nonetheless applying it).

Recognizing the danger of a strong "compelling reason" standard, this Court's decision in *Sitz*, 443 Mich 744, clarified that the "compelling reason" language "should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law." *Id*. at 758. "Properly understood, the *Nash* rule compels neither the acceptance of federal interpretation nor its rejection." *Id*. at 758-759. So while we must "reject unprincipled creation of state constitutional rights that

29

exceed their federal counterparts," we "are not obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so." *Id*. at 763. "As a matter of simple logic, because the texts were written at different times by different people, the protections afforded may be greater, lesser, or the same." *Id*. at 762.

We built on *Sitz*'s sentiments in *Tanner*. In that case, we reiterated that this Court need not recognize the "informal presumption that a United States Supreme Court interpretation of a federal constitutional provision constitutes the proper interpretation of a similar or identical state constitutional provision . . . unless we are persuaded that such an interpretation is also most faithful to the state constitutional provision." *Tanner*, 496 Mich at 222 n 16. Squarely addressing the "compelling reason" language, we again emphasized its limited utility by explaining that a strong presumption in favor of federal interpretations

> cannot precisely describe this Court's relationship with the federal judiciary, even with the United States Supreme Court. While it may almost always be prudent and responsible for this Court to examine federal precedents when they pertain to the same or similar language as in the Michigan Constitution, our responsibility in giving meaning to the Michigan Constitution must invariably focus upon *its* particular language and history, and the specific intentions of *its* ratifiers, and not those of the federal Constitution. Simply put, our exercise of judgment concerning the reasonable meaning of the provisions of our state Constitution cannot, consistently with our oath of office and our structure of constitutional federalism, be delegated to another judicial body. [*Id*.]

Consequently, "we need not, and cannot, defer to the United States Supreme Court" in expounding the Michigan Constitution but must instead "independently examine our state's Constitution to ascertain the intentions of those in whose name our Constitution was

30

'ordain[ed] and establish[ed].' " *Id*. at 221-222, quoting Const 1963, Preamble (brackets in *Tanner*).[16]

Today, we reaffirm the principles elucidated in *Sitz* and *Tanner*. This Court's solemn duty is to faithfully interpret our state Constitution "consistently with our oath of office and our structure of constitutional federalism." *Tanner*, 496 Mich at 223 n 16. In so doing, we may respectfully consider federal interpretations but need not treat such authorities as presumptively correct unless the history of the particular state provision—or the federal Supremacy Clause—demands as much. This Court must instead, from the outset, "independently analyze our state Constitution to ensure that our citizens are receiving the measure of the protections that *they* created, which protections may or may not extend beyond those set forth by the federal Constitution." *Id*. at 222 n 15. Were it otherwise, the interpretation of Michigan's Constitution would be subject to the changing jurisprudence of the United States Supreme Court. And such an approach would violate

---

[16] To be sure, "[t]his Court has referred to various factors that may be relevant in determining whether Michigan's Constitution supports an interpretation that differs from that of the United States Constitution[.]" *Tanner*, 496 Mich at 223 n 17. These factors include:

> "1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest." [*Id*. (citations omitted).]

Although "application of these factors will often prove helpful," the "ultimate task facing this Court in cases requiring interpretation of particular Michigan constitutional provisions is to respectfully consider federal interpretations of identical or similar federal constitutional provisions, but then to undertake by traditional interpretive methods to independently ascertain the meaning of the Michigan Constitution." *Id*.

31

this Court's obligation to independently examine our Constitution to effect the intentions of its ratifiers. *Id*. at 222.

## 2. ARTICLE 1, § 15 OF MICHIGAN'S 1963 CONSTITUTION

Having framed the analytical lens through which we construe our state Constitution, we now turn to the particularities of Article 1, § 15 to determine when retrial is barred after a mistrial predicated upon prosecutorial misconduct. Because our interpretive North Star is the "original meaning to the ratifiers, the people, at the time of ratification," *Hathcock*, 471 Mich at 468, we must pay close attention to the history and circumstances surrounding the adoption of Article 1, § 15.

As noted above, Article 1, § 15 currently provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy." But the pendulum of double-jeopardy protections guaranteed by the plain text of our state Constitution has swung back and forth over the years. Article 1, § 12, of Michigan's 1835 Constitution mirrored the modern-day Article 1, § 15, by providing that "[n]o person for the same offense, shall be twice put in jeopardy of punishment." However, the ratifiers of Michigan's 1850 Constitution narrowed this language, limiting state double-jeopardy protections to retrial after an "acquittal upon the merits." Const 1850, art 6, § 29 (providing that "[n]o person, after acquittal upon the merits, shall be tried for the same offense"); see *Nutt*, 469 Mich at 582 n 20. And the ratifiers of Michigan's 1908 Constitution retained this narrower language. Const 1908, art 2, § 14 ("No person, after acquittal upon the merits, shall be tried for the same offense."). Despite the narrower language of the 1850 and 1908 provisions, this Court still interpreted them "in the same manner as the Fifth Amendment was traditionally

32

understood to apply." *Nutt*, 469 Mich at 582 n 20 (collecting cases). When our 1963 Constitution was ratified, then, "it had long been established" that the double-jeopardy provisions in earlier constitutions were "construed coterminously with the common law . . . ." *Id*. at 583.

To account for the interpretive practice of this Court, the ratifiers of Michigan's 1963 Constitution resorted back to broader language that tracked the language of the original 1835 provision and the Fifth Amendment. See *id*. at 588-589 & n 25. One 1961 Constitutional Convention delegate explained that "[t]he Supreme Court of Michigan . . . has virtually held that [Const 1908, art 2, § 14] means the same thing as the provision in the federal constitution, which is what we have put in . . . ." 1 Official Record, Constitutional Convention 1961, p 539. The Address to the People[17] confirmed this intent:

> [Const 1963, art 1, § 15] is a revision of Sec. 14, Article II, of the present constitution. The new language of the first sentence involves the substitution of the double jeopardy provision from the U.S. Constitution in place of the present provision which merely prohibits [sic] "acquittal on the merits." This is more consistent with the actual practice of the courts in Michigan. [Address to the People, 2 Official Record, Constitutional Convention 1961, p 3364.]

Accordingly, the ratifiers of Article 1, § 15 "intended that our double jeopardy provision be construed consistently with *then-existing* Michigan caselaw and with the interpretation given to the Fifth Amendment by federal courts *at the time of ratification*." *People v Smith*, 478 Mich 292, 315; 733 NW2d 351 (2007) (emphasis added). See also *People v Davis*, 472 Mich 156, 168; 695 NW2d 45 (2005) ("As noted in *Nutt*, the common understanding

---

[17] The "Address to the People" was a document "widely distributed to the public prior to the ratification vote in order to explain the import of the sundry proposals . . . ." *Nutt*, 469 Mich at 590 n 26.

33

of the people at the time that our double jeopardy provision was ratified was that the provision would be construed consistently with the federal double jeopardy jurisprudence *that then existed*.") (emphasis added).

Despite there being no general presumption that federal interpretations of federal law control state interpretations of state law, the above history illustrates the intertwined relationship between the historic interpretations of Article 1, § 15, and the Double Jeopardy Clause of the Fifth Amendment. Recognizing as much is not a departure from our duty to independently interpret our state Constitution; it is instead giving effect to the unremarkable fact that the ratifiers sometimes looked to then-existing federal principles in crafting it. For instance, because pre-1963 federal caselaw set forth a clear test for determining when double jeopardy bars successive prosecutions for the "same offense," we adopted that test under Article 1, § 15. *Nutt*, 469 Mich at 575. See also *Smith*, 478 Mich at 315-316 (applying similar reasoning to the multiple-punishments strand of double jeopardy). Likewise, because pre-1963 federal caselaw provided a clear standard for the permissibility of successive prosecutions by different sovereigns, we incorporated that standard under Article 1, § 15, too. *Davis*, 472 Mich at 168. The upshot of these cases is that when federal double-jeopardy jurisprudence offered a clear standard *at or before* the time that Article 1, § 15 was ratified, we presume that the ratifiers intended for that standard to apply under the Michigan Constitution.[18]

---

[18] Justice ZAHRA's contention that our opinion today overrules a number of unrelated double-jeopardy cases is mistaken. In his haste to justify his assessment of this Court doing "what it wants, when it wants, . . . how it wants," Justice ZAHRA overlooks that the analytical framework we employ here—looking to principles from the time or before the time of ratification—is entirely consistent with the analytical framework employed in the cases he accuses us of overruling. See, e.g., *People v Ream*, 481 Mich 223, 239; 750 NW2d

But this general principle is not—and never has been—a categorical rule that forever handcuffs this Court to federal double-jeopardy jurisprudence. As we clarified in *Smith*, "stating that the Michigan and federal double jeopardy clauses should be construed in a parallel fashion" in some cases does " 'not mean that we are bound in our understanding of the Michigan Constitution by any particular interpretation of the United States Constitution.' " *Smith*, 478 Mich at 302 n 7, quoting *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003). "We mean only that we have been persuaded in the past that interpretations of the Double Jeopardy Clause of the Fifth Amendment have accurately conveyed the meaning of Const 1963, art 1, § 15 as well." *Smith*, 478 Mich at 302 n 7. So whether federal jurisprudence accurately reflects the meaning of Article 1, § 15—or any state constitutional provision, for that matter—remains a case-by-case inquiry that hinges on the history of the precise legal doctrine in question.[19]

536 (2008) ("[I]n adopting Const 1963, art 1, § 15, the ratifiers of our constitution intended our double-jeopardy provision to be construed consistently with the interpretation given to the Fifth Amendment by federal courts *at the time of ratification*.") (emphasis added); *Nutt*, 469 Mich at 590 n 25 ("We are nevertheless compelled to look to the state of the law *as it existed in 1963* . . . to determine what, precisely, the people intended in adopting art 1, § 15.") (emphasis added); *Davis*, 472 Mich at 168 (same); *Smith*, 478 Mich at 315 (same). We therefore fail to understand how applying that same framework to the distinct question presented here calls into question those cases. In fact, it is Justice ZAHRA's approach—relying entirely on a federal case whose reasoning was not at all foreshadowed at the time of ratification—that would require a departure from the well-established principles of constitutional interpretation repeatedly reaffirmed by this Court. Beyond that, none of the cases cited by Justice ZAHRA (save *Dawson*) pertain to the discrete issue presented here, which, like most legal questions, carries with it a unique history and body of caselaw. Because we do not overturn any precedent in this case, no stare decisis analysis is necessary.

[19] Looking to other bodies of state constitutional law bolsters this conclusion. For example, in the realm of unreasonable searches and seizures, some of our cases state the broad proposition that Article 1, § 11—Michigan's search-and-seizure provision—should generally be interpreted in the same manner as the United States Supreme Court has

For this reason, we reject the idea that an intent to incorporate some *then-existing* federal protections into Article 1, § 15, translates to eternal "lockstepping" with federal jurisprudence, no matter the novelty or unforeseeable nature of subsequent federal interpretations.[20] Mechanically adopting the *Kennedy* rule, announced some 20 years *after* the people ratified Article 1, § 15, would breach our duty to determine the law made by the people in ratifying Michigan's 1963 Constitution. See *Tanner*, 496 Mich at 221-222 & n 16. See also *State ex rel Cincinnati Enquirer v Bloom*, 177 Ohio St 3d 174, 184; 2024-Ohio-5029; 251 NE3d 79 (2024) ("But when we say that our state Constitution means whatever the United States Supreme Court says that the federal Constitution means, we ignore our obligation to the [state] Constitution, and we delegate away our duty to say what the law is."). Such lockstepping would also allow a faraway federal court—one consisting of judicial officers who have never sworn an oath to uphold the Michigan Constitution— to define or retract important rights otherwise guaranteed under our autonomous state Constitution. The presumption of incorporation is therefore temporally bounded under Article 1, § 15: federal interpretations existing at the time of ratification may be presumed

---

interpreted the Fourth Amendment. See, e.g., *Collins*, 438 Mich at 25. But despite this broad proclamation, our Court has nevertheless departed from federal Fourth Amendment jurisprudence in at least one significant respect. See *Sitz*, 443 Mich 744 (holding that warrantless and suspicionless sobriety checkpoints violate Article 1, § 11, even though post-1963 United States Supreme Court caselaw holds that they do not violate the Fourth Amendment). Resolving questions of state constitutional law with a scalpel instead of a sledgehammer is thus not a novel or remarkable step for this Court to take.

[20] "Lockstepping" has been critically defined as state courts' "reflexive imitation of the federal courts' interpretation of the Federal Constitution." Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (Oxford: Oxford University Press, 2018), p 174.

to have been adopted because the ratifiers could be understood to have embraced them, but federal interpretations announced *after* ratification carry no such presumption because the ratifiers could not have spoken to a rule that did not yet exist.[21] We thus decline to adopt the *post*-1963 *Kennedy* standard merely because we have adopted *pre*-1963 federal standards in other double-jeopardy contexts.

### 3. *KENNEDY* AND ARTICLE 1, § 15

Freed from any presumption that *Kennedy* governs by default, we return to the more nuanced issue presented in this case: the circumstances under which improper prosecutorial conduct bars retrial under Article 1, § 15. The primary difficulty is that neither the plain text of Article 1, § 15, nor authoritative pre-1963 precedent directly addresses this precise issue. Unsurprisingly, then, neither the parties' submissions nor our review of the 1961 Constitutional Convention debates yielded any specific discussions pertaining to whether and when retrial is barred after a defendant successfully moves for a mistrial based on

---

[21] For this reason, we reject the unavoidable consequence of Justice ZAHRA's logic: that we are forever tied to United States Supreme Court double-jeopardy caselaw, regardless of how dramatically it changes after 1963. Indeed, our review of the Constitutional Convention debates and the Address to the People yielded no evidence that the ratifiers of Michigan's 1963 Constitution had a crystal ball that allowed them to predict exactly how the United States Supreme Court would alter double-jeopardy protections in the context of prosecutorial misconduct. Nor do these sources provide any evidence that the ratifiers intended to preapprove federal caselaw in perpetuity. And for good reason. If the United States Supreme Court someday holds that the Fifth Amendment no longer provides *any* protection in the present context, would we be forced to adopt that holding under Article 1, § 15? Asking the question answers it: We must instead look to double-jeopardy principles that existed at the time of ratification to best capture the ratifiers' intent. And for the reasons expressed in this opinion, such an analysis establishes that they did not intend to so restrict the rights guaranteed by Article 1, § 15.

improper prosecutorial conduct. In this respect, the instant case presents a more challenging question than many past cases involving our state Constitution.

But we are not left without guidance in determining the scope of protections provided by Article 1, § 15. Where the plain text and pre-ratification caselaw are silent on a particular question, we must look to well-established background principles of double jeopardy from the time of ratification. These principles demonstrate that, by 1963, it was settled that double-jeopardy protections safeguarded the individual's interest in not having to twice run the gauntlet, see *Green*, 355 US at 190, and not being "harassed by successive, oppressive prosecutions," *Gori v United States*, 367 US 364, 369; 81 S Ct 1523; 6 L Ed 2d 901 (1961), along with his "valued right to have his trial completed by a particular tribunal," *Wade*, 336 US at 689. While these protections must sometimes give way to countervailing societal interests, it bears repeating the "deeply ingrained" idea that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual" for the same offense, "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green*, 355 US at 187-188.

As we have concluded before, these principles accurately reflect the purpose of double-jeopardy protections under our state Constitution. See, e.g., *Nutt*, 469 Mich at 575 n 10; *People v Herron*, 464 Mich 593, 601; 628 NW2d 528 (2001); *Dawson*, 431 Mich at 251; *Anderson*, 409 Mich at 483 n 15. Article 1, § 15, thus "protects a defendant not only from 'declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' but also from '[h]arassment of an accused by successive prosecutions.' "

*Kennedy*, 456 US at 690 n 31 (Stevens, J., concurring), quoting *Downum*, 372 US at 736 (brackets in *Kennedy*). Accordingly, this general policy against retrials and governmental harassment leads us to agree with *Kennedy*'s general premise that a "defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances." *Kennedy*, 456 US at 673.

But our assent with *Kennedy* ends there because this "hollow shell" can remain equally empty beyond the narrow instance in which the prosecutor intentionally provokes a mistrial. See, e.g., *Breit*, 122 NM at 662 (explaining that one of the primary shortcomings of *Kennedy* "is highlighted by the fact that other forms of misconduct and harassment and bad faith can also leave a defendant with little choice"). The protections guaranteed by Article 1, § 15, are similarly diluted when, for example, a mistrial is declared after the prosecutor intentionally engages in egregious misconduct to shore up a weak case—i.e., to avoid an acquittal—rather than to goad the defendant into moving for a mistrial. So too where the state repeatedly "put[s] the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if [it] cannot obtain a conviction." *Id*. In these situations, "the burden of a second trial is not attributable to the defendant's preference for a new trial, but to the state's readiness to force him to make that choice." *Dawson*, 154 Mich App at 270. It follows that double-jeopardy protections should apply the same way in those scenarios as they do in goading cases.

As a result, whether the prosecution intentionally pursues "an improper course of conduct because [it] means to goad a defendant into demanding a mistrial or because [it] is willing to accept a mistrial and start over is a distinction without a difference" under

39

Article 1, § 15. See *Kennedy*, 295 Or at 273. Indeed, the purpose of double-jeopardy protections is *not* to penalize unethical government officials but rather to protect an individual's "valued right to have his trial completed by a particular tribunal," *Wade*, 336 US at 689, while also preventing the harassment of successive prosecutions, *Green*, 355 US at 187. Because these interests are impaired by intentional misconduct beyond goading, we are convinced that the *Kennedy* standard gives short shrift to the Court's "own pronouncements regarding the purpose of the double jeopardy clause," *Pool*, 139 Ariz at 108—the backdrop upon which Article 1, § 15, was ratified, *Davis*, 472 Mich at 168.

The practical effect of *Kennedy*'s narrow standard further supports this conclusion. Without a concession from the state, proving that a prosecutor harbored the specific intent to goad the defendant into moving for a mistrial (rather than, say, an intent to harass the defendant or prejudice the defendant's chance of acquittal) is virtually impossible. See, e.g., *Kennedy*, 456 US at 688 (Stevens, J., concurring); *Thomas*, 133 Nev at 473 (collecting cases and noting "the difficulty in proving a prosecutor's specific intent to provoke a mistrial"); *Jennings* (SHAPIRO, J., dissenting), unpub op at 4 ("Demonstrating that a prosecutor specifically intended to cause a mistrial insufficiently protects the principles of double jeopardy because absent an admission . . . it is virtually impossible to determine what the prosecutor's subjective intent was.").[22] "It is far more likely . . . that the

---

[22] As one commentator noted, "[D]efendants face extreme difficulty in proving, with the evidence available to them (such as the prosecutor's overall conduct at trial), that the prosecutorial misconduct was aimed to provoke a mistrial rather than to prejudice the defendant in another way." Note, *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct*, 122 Colum L Rev at 197. "Given that a prosecutor who decides to force the defendant into moving for a mistrial may do so in the heat of the moment— when he or she sees the first trial going awry, for example—it is unlikely that the

40

Government engages in misconduct with the general purpose of prejudicing the defendant" rather than specifically intending to force the defense's hand into moving for a mistrial. *Green v United States*, 451 US 929, 931 n 2 (1981) (Marshall, J., dissenting) (denying certiorari). In light of this practical reality, we fail to see how trial courts can be expected to accurately differentiate an intent to provoke a mistrial from an intent to strengthen the state's case, harass the defendant, or some combination of both. Because "the subjective intentions of the prosecutor are inherently unknowable" in the vast majority of cases, *Breit*, 122 NM at 663, the herculean burden of proving a specific intent to goad effectively makes this exception an illusory one. See *Kennedy*, 456 US at 688 (Stevens, J., concurring).

Nor are we persuaded that *Kennedy* should be adopted on workability grounds. While the *Kennedy* test might be easy to apply, "[t]he succinctness and manageability of a standard of law does not necessarily bespeak its justness or applicability to the problem it is intended to address." *Breit*, 122 NM at 661. And despite *Kennedy*'s surface-level appeal, we have outlined the significant difficulties with its operation in practice. The test demonstrates how placing outsized emphasis on "workability" or "manageability" can easily lead to watered-down constitutional protections. Furthermore, as explained in more detail below, we are not convinced that a broader standard is prohibitively unworkable.

Under longstanding principles of double-jeopardy law, we conclude that the unduly rigid *Kennedy* standard—announced for the first time years *after* ratification of Michigan's

---

defendant would have evidence sufficient to establish the prosecutor's specific intent." *Id*. at 197-198.

41

1963 Constitution—fails to fully realize the protections ensured by Article 1, § 15, of Michigan's 1963 Constitution. We therefore reject it under Michigan law.[23]

## 4. THE PROPER TEST UNDER ARTICLE 1, § 15

Having rejected *Kennedy* under Article 1, § 15, we now consider the appropriate standard in Michigan. At the outset, we disagree with *Kennedy* that a rule beyond the narrow instance of goading would "offer virtually no standards." *Kennedy*, 456 US at 674-675. We instead conclude that the test articulated by the Arizona Supreme Court—and formerly adopted by our Court of Appeals in *Dawson*, 154 Mich App 260—is more in line with both the longstanding double-jeopardy principles incorporated into our state Constitution and our pre-*Kennedy* caselaw on this subject.

To begin with, *Pool* provides a workable standard that best balances society's interest in "punishing one whose guilt is clear," *Tateo*, 377 US at 466, with an individual's right to be free from state harassment, successive prosecutions, and the "embarrassment, expense and ordeal" that results, *Green*, 355 US at 187-188. It does so by recognizing that double-jeopardy interests are implicated both in the context of goading *and* whenever a prosecutor intentionally engages in misconduct egregious enough to necessitate a mistrial.

[23] Despite correctly recognizing that the ratifiers intended to incorporate *then-existing* double-jeopardy principles into Article 1, § 15, Justice ZAHRA fails to identify any pre-1963 cases, historical sources, or other relevant principles that support the narrow rule first announced two decades later in *Kennedy*. Although we recognize that this inquiry is somewhat difficult due to a dearth of directly on-point authorities from that era, we believe that our rejection of *Kennedy* better reflects longstanding double-jeopardy principles that the ratifiers presumably contemplated when enacting Article 1, § 15, along with pre-*Kennedy* caselaw from this Court that cited the broader bad-faith standard rejected in *Kennedy*. See, e.g., *Benton*, 402 Mich at 63-64 (opinion by LEVIN, J.); *Anderson*, 409 Mich at 485. And as mentioned earlier, this Court never overturned the line of cases approving of the *Jorn* and *Lee* standard, such as *Benton* and *Anderson*.

In both situations, a defendant is forced to face trial more than once due to intentional governmental wrongdoing. We thus agree with Judge SHAPIRO that the *Pool* standard "is both easier to apply than *Kennedy*'s subjective standard and a more appropriate means of protecting the right against double jeopardy" under Article 1, § 15. *Jennings* (SHAPIRO, J., dissenting), unpub op at 1. Accordingly, we hold that retrial is barred under Article 1, § 15, when the following elements are satisfied:

> 1. Mistrial is granted because of improper conduct or actions by the prosecutor; and
>
> 2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and
>
> 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial. [*Pool*, 139 Ariz at 108-109.]

Under this test, determining the prosecutor's knowledge or intent will often turn on objective circumstances surrounding the trial, including

> the situation in which the prosecutor found himself, the evidence of actual knowledge and intent and any other factors which may give rise to an appropriate inference or conclusion. [A court] may also consider the prosecutor's own explanations of his "knowledge" and "intent" to the extent that such explanation can be given credence in light of the minimum requirements expected of all lawyers. [*Id.* at 108 n 9.]

After all, as the *Pool* court recognized, "there must be a point at which lawyers are conclusively presumed to know what is proper and what is not." *Id.* at 107. Courts should

also consider the strength of the case against the defendant and any "danger of acquittal" that may have arisen. *Id*. at 107, 109.[24]

We further note that, along with being adopted by a past panel of our Court of Appeals, the *Pool* formulation tracks pre-*Kennedy* caselaw from this Court. After the ratification of our 1963 Constitution, but before *Kennedy*, this Court affirmed the double-jeopardy principles espoused in *Green* and recognized the broader bad-faith standard for determining when prosecutorial misconduct bars retrial. See, e.g., *Benton*, 402 Mich at 63-64 (opinion by LEVIN, J.) (noting that "where the defendant requests the mistrial, retrials may be barred when the judge or prosecutor acted in bad faith"); *Anderson*, 409 Mich at 485 (citing *Jorn* and *Lee* in explaining that retrial is barred "when the defendant's motion is induced by bad-faith conduct of the prosecutor or judge"). By probing whether the prosecutor engaged in "intentional conduct which the prosecutor knows to be improper and prejudicial," *Pool*, 139 Ariz at 108-109, the *Pool* test is essentially a more detailed articulation of the bad-faith standard we recognized in *Anderson* and *Benton*. Accordingly, prior caselaw further supports our conclusion to depart from *Kennedy* and adopt the formulation set forth in *Pool*.

---

[24] This test also demonstrates how a standard beyond the one set forth in *Kennedy* can be workable for trial courts and litigants to apply. "If a trial court is considered competent to determine whether a prosecutor had the intent to goad the defendant into moving for a mistrial, it ought to be able to determine whether the prosecutor committed misconduct that the prosecutor knows to be improper and prejudicial[.]" Note, *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct*, 122 Colum L Rev at 209 (quotation marks and citations omitted). So we discern no basis to conclude that the *Pool* formulation is any more amorphous or unmanageable than the *Kennedy* standard, as both tests rely largely on inferences and circumstantial evidence.

We do, however, emphasize that a criminal defendant still bears a heavy burden to bar retrial under the standard we articulate today. Because Article 1, § 15, concerns governmental *harassment* of an accused, only intentional misconduct opens the door to barring retrial. See *Dawson*, 154 Mich App at 271 ("The clause's guarantee against harassment of individuals by multiple prosecutions implies a requirement of some conscious choice of prejudicial action or willingness to risk placing the defendant repeatedly in jeopardy before the guarantee bars retrial."). Mere error or negligence is not enough.[25] Furthermore, the misconduct must be so prejudicial that a mistrial is the only appropriate remedy. "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). That is why "[b]efore ordering a mistrial, the court must, on the record, give each defendant and the prosecutor an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." MCR 6.417. See also *Benton*, 402 Mich at 65 (opinion by LEVIN, J.).[26] Consequently, our holding should not be read to suggest that all instances of prosecutorial error or misconduct implicate the protections guaranteed by Article 1, § 15.[27]

---

[25] We accordingly decline defendant's request to adopt a standard, like Pennsylvania's, that does not require intentional misconduct of any kind. See *Johnson*, 659 Pa at 309.

[26] While of course dependent on the kind of misconduct alleged, mistrial alternatives include, among other things, curative instructions, *People v Manning*, 434 Mich 1, 7-9; 450 NW2d 534 (1990), and adjournments, see MCR 2.503(B)(1).

[27] We further note that our holding today is confined to the mistrial context. Therefore, we leave for another day the distinct question of whether Article 1, § 15, may bar retrial when a conviction is reversed on direct appeal due to egregious prosecutorial misconduct.

## IV. DISPOSITION

Defendant argues that his second trial violated Article 1, § 15, because his initial trial ended in a mistrial after the prosecutor improperly used defendant's invocation of his right to silence as proof of guilt. We decline to decide that question in the first instance. Because the trial court applied the *Kennedy* standard, the factual record is insufficient to determine whether defendant's retrial violated Article 1, § 15, under the standard we announce today. The trial court did not, for instance, make any findings on whether the prosecutor engaged in "intentional conduct which the prosecutor kn[ew] to be improper and prejudicial, and which he pursue[d] for any improper purpose with indifference to a significant resulting danger of mistrial or reversal," *Pool*, 139 Ariz at 108-109, or whether the prosecutor's explanation should be "given credence in light of the minimum requirements expected of all lawyers," *id*. at 108 n 9. Nor did the trial court make any findings on the strength of the prosecution's case at the first trial and any danger of acquittal. *Id*. at 109.[28] We therefore remand this case to the trial court for application of the standard articulated in this opinion. On remand, the trial court may accept briefing and

---

[28] Consequently, we disagree with Justice ZAHRA that the Court of Appeals' discussion of *Pool* obviates the need for a remand to the trial court. For one thing, that contention disregards that the trial court never applied *Pool* and thus did not make the full factual findings required by the standard we adopt today. See *In re Martin*, 200 Mich App 703, 717; 504 NW2d 917 (1993) ("It is not the function of an appellate court to decide disputed questions of fact in the first instance and then choose between affirmance or reversal by testing its factual conclusion against that which the trial court *might* have . . . reached.") (quotation marks and citation omitted; ellipsis in *In re Martin*). For another, the Court of Appeals' brief discussion of *Pool* described that standard as "whether the prosecutor's actions evince an *intent to cause a mistrial*," *Jennings*, unpub op at 4 (emphasis added), and applied it accordingly. Yet that articulation is actually the narrower *Kennedy* standard that we reject today. Therefore, a remand to the trial court for application of the standard set forth herein is warranted under these circumstances.

hold an evidentiary hearing to resolve any factual disputes material to this inquiry. We reiterate, however, that the trial court's inquiry must rely primarily upon "objective factors" and the circumstances of this particular case. See *Pool*, 139 Ariz at 108 n 9.

## V. CONCLUSION

We conclude that the narrow *Kennedy* standard conflicts with the double-jeopardy protections guaranteed by Article 1, § 15, of Michigan's 1963 Constitution. We therefore reject *Kennedy* under state law and instead adopt the three-factor test from *Pool*, 139 Ariz 98, as that standard is more consistent with the intent of the ratifiers of Article 1, § 15. Accordingly, we vacate the Court of Appeals' judgment and remand this case to the trial court for application of the appropriate state standard in the first instance. We do not retain jurisdiction.

Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

47

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                        No. 165764

DEVANTE KYRAN JENNINGS,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

      Nearly 45 years ago, the Supreme Court of the United States in *Oregon v Kennedy*[1] established a test used to determine whether federal double-jeopardy protections bar retrial when a criminal defendant moves for a mistrial based on prosecutorial misconduct. Soon thereafter, this Court in *People v Dawson*[2] "adopt[ed] the federal [*Kennedy*] standard" under our Michigan double-jeopardy jurisprudence and held "that retrial is barred where the prosecutor intended to goad the defendant into moving for a mistrial."[3] Today, a majority of this Court overrules *Dawson* and rejects the *Kennedy* standard, which has been soundly in place in Michigan for nearly 40 years, and arbitrarily adopts a test created by the Arizona Supreme Court.

_____

[1] *Oregon v Kennedy*, 456 US 667, 676; 102 S Ct 2083; 72 L Ed 2d 416 (1982).

[2] *People v Dawson*, 431 Mich 234; 427 NW2d 886 (1988).

[3] *Id.* at 236.

The majority opinion sets aside decades of this Court's caselaw. Even worse, it tramples on the clear intent of the ratifiers of Const 1963, art 1, § 15, who "intended to continue to accord the same double jeopardy protection under art 1, § 15 that was provided by the Fifth Amendment[.]"[4] The majority opinion articulates no sound reason for now holding that our Double Jeopardy Clause provides broader protection than the federal Double Jeopardy Clause, let alone a compelling one, and conducts no stare decisis analysis before casting aside numerous cases from this Court that have repeatedly reaffirmed and embraced Michigan's commitment to the *Kennedy* standard. The majority opinion finds appeal in tests used in other states, which of course provide no authority as to how we interpret our 1963 Michigan Constitution and the intent of those who ratified it. Moreover, this case is not a proper vehicle for adopting a new standard because neither the *Kennedy*

---

[4] *People v Nutt*, 469 Mich 565, 596; 677 NW2d 1 (2004). See also *People v Beck*, 510 Mich 1, 11 n 1; 987 NW2d 1 (2022) ("While we are not bound to interpret our Constitution consistently with similar provisions of the United States Constitution, 'we have been persuaded in the past that interpretations of the Double Jeopardy Clause of the Fifth Amendment have accurately conveyed the meaning of Const 1963, art 1, § 15.' Therefore, our analysis is the same under each.") (citation omitted); *People v Szalma*, 487 Mich 708, 716; 790 NW2d 662 (2010) ("[T]he people of this state intended that our double jeopardy provision would be construed consistently with Michigan precedent and the Fifth Amendment.") (quotation marks and citation omitted); *People v Ream*, 481 Mich 223, 233; 750 NW2d 536 (2008) (explaining that the "conclusion that the Michigan Constitution affords greater protection than the Fifth Amendment has no basis in the language of Const 1963, art 1, § 15, the common understanding of that language by the ratifiers, or under Michigan caselaw as it existed at the time of ratification") (quotation marks and citation omitted); *People v Smith*, 478 Mich 292, 321-322; 733 NW2d 351 (2007) (explaining that "the expressed intentions of the ratifiers [were] that Michigan's Double Jeopardy Clause be interpreted in a manner consistent with the federal constitution"); *People v Davis*, 472 Mich 156, 161; 695 NW2d 45 (2005) ("[I]n adopting art 1, § 15, the people of this state intended that our double jeopardy provision would be construed consistently with Michigan precedent and the Fifth Amendment.") (quotation marks and citation omitted).

2

standard nor Arizona's *Pool*[5] test is satisfied, as the Court of Appeals correctly determined. Today's decision is driven by this Court's overwhelming desire to "simply engraft onto" Article 1, § 15 "more 'enlightened' rights than the framers intended."[6] Regardless of how well-intentioned my colleagues may be in their search for more enlightened rights, it is an abuse of judicial power for this Court to substitute its assessment of the quality of constitutional rights over the rights understood and intended by the people who ratified our Constitution. Accordingly, I dissent.

## I. FACTUAL AND PROCEDURAL HISTORY

I agree with the majority opinion's recitation of the relevant facts and history of the trial court proceedings.[7] I disagree, however, with the majority opinion's incomplete characterization of the majority opinion from the Court of Appeals. When describing the Court of Appeals majority opinion, it explains that the Court of Appeals determined that the *Kennedy* test was not satisfied here because the prosecutor did not intentionally goad

---

[5] *Pool v Superior Court*, 139 Ariz 98, 108-109; 677 P2d 261 (1984).

[6] See *Sitz v Dep't of State Police*, 443 Mich 744, 759; 506 NW2d 209 (1993).

[7] I would, however, include some additional findings made by the trial court when it determined that a second trial would not violate defendant's double-jeopardy rights. The trial court indicated that the record lacked evidence that the prosecutor specifically intended to provoke defendant into moving for a mistrial. The prosecutor denied having such intent, arguing that he was "trying to argue for [a] conviction to get the jury to find [defendant] guilty, not for a mistrial." The trial court also cited defense counsel's lack of objections, noting that "I'm not even sure that we would have a mistrial motion brought before this Court if this Court did not highlight the fact that the prosecution had overstepped their bounds," and that "when the defense doesn't even object during the course of the testimony or in argument as to that, I can hardly find that the prosecution actually intended to somehow elicit this mistrial when the foundation was laid during testimony." Therefore, the trial court denied defendant's request to bar retrial.

3

the defendant into requesting a mistrial. But the majority opinion of this Court fails to note that the Court of Appeals also determined that even the more defendant-friendly *Pool* test used by the Arizona Supreme Court—the test adopted by the Court's majority today—would also not be satisfied under the facts of this case. It is misleading for this Court's majority opinion to fully describe the Court of Appeals dissent and why Judge SHAPIRO would conclude that both tests were satisfied, but when describing the Court of Appeals majority opinion, to merely state that the panel determined that the *Kennedy* test was not satisfied without describing why it also determined, based on the trial court's findings and evidence in the record, that the *Pool* test was not satisfied.[8] Moreover, the Court remands this case to the trial court to determine whether the *Pool* test is satisfied. But the Court's majority opinion fails to acknowledge that the Court of Appeals already determined *Pool* was not satisfied. It seems that the majority opinion purposefully glosses over the Court of Appeals' conclusion that defendant is not entitled to relief under the very test that it today adopts, perhaps to justify adopting the test in the first place.

## II. STANDARD OF REVIEW

The question of whether a defendant's retrial violates the double-jeopardy provisions of the United States and Michigan Constitutions is a question this Court reviews

---

[8] The majority opinion merely states in a footnote that "[t]he [Court of Appeals] majority rejected the dissent's invitation to adopt a different standard as to when double jeopardy bars retrial in this context because, in the majority's opinion, 'there is little evidence to support the conclusion that defendant could meet' either of the proffered tests." (Quoting *People v Jennings*, unpublished opinion per curiam of the Court of Appeals, issued April 20, 2023 (Docket No. 359837), p 4 n 2.)

4

de novo.[9]  Michigan's double-jeopardy provision is "construed consistently with Michigan precedent and the Fifth Amendment."[10]  Retrial following a mistrial is permissible where the mistrial was required by "manifest necessity" or where a defendant consents to retrial.[11] "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."[12]  "Ordinarily a trial judge will determine whether the prosecutor intended to goad the defendant into moving for a mistrial."[13]  This factual determination is reviewed for clear error.[14]

## III.  ANALYSIS

The majority opinion states that the question before us is "whether the Michigan Constitution affords greater protection than its federal analogue[.]"  But we have already answered that question many times before.  We have made clear that "the meaning ascribed to a federal constitutional provision by the United States Supreme Court is not dispositive, except to the extent that it appears—as we have explained that it does in the case of Const 1963, art 1, § 15—that the ratifiers of our Constitution *intended* that a provision be

---

[9] *Szalma*, 487 Mich at 715.

[10] *Id*. at 716 (quotation marks and citation omitted).

[11] *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997).

[12] *Kennedy*, 456 US at 676; see *Dawson*, 431 Mich at 236.

[13] *Dawson*, 431 Mich at 258.

[14] *Id*.

5

construed consistently with the corresponding federal provision."[15] Moreover, we have held that the "conclusion that the Michigan Constitution affords greater protection than the Fifth Amendment has no basis in the language of Const 1963, art 1, § 15, the common understanding of that language by the ratifiers, or under Michigan caselaw as it existed at the time of ratification."[16] We followed the ratifiers' intent when we "adopt[ed] the federal [*Kennedy*] standard" almost 40 years ago.[17] In rejecting the *Kennedy* standard, this Court overturns decades of our Court's caselaw and the intent of the ratifiers of Const 1963, art 1, § 15 without conducting a stare decisis analysis or providing any sound reason for doing so. The mere fact that the majority of this Court prefers a test used by a different state cannot overcome our ratifiers' intent because it is "the *ratifiers'* policy choices, and not those of the judiciary, which must govern our interpretation of the constitution."[18]

## A. ARTICLE 1, § 15 OF MICHIGAN'S 1963 CONSTITUTION IS TO BE INTERPRETED CONSISTENTLY WITH THE FIFTH AMENDMENT OF THE FEDERAL CONSTITUTION

Our "primary objective" in interpreting the Michigan Constitution is "to determine the text's original meaning to the ratifiers, the people, at the time of ratification."[19] The Fifth Amendment of the United States Constitution protects a criminal defendant from

---

[15] *Nutt*, 469 Mich at 594.

[16] *Smith*, 478 Mich at 314; see also *Ream*, 481 Mich at 233.

[17] *Dawson*, 431 Mich at 236.

[18] See *Smith*, 478 Mich at 321.

[19] *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 456; 952 NW2d 434 (2020) (quotation marks and citation omitted).

" 'be[ing] subject for the same offence to be twice put in jeopardy of life or limb . . . .' "[20] A parallel provision of the Michigan Constitution provides a criminal defendant with similar protection: "No person shall be subject for the same offense to be twice put in jeopardy."[21] "In adopting this parallel provision," this Court has made clear that " 'the people of this state intended that our double jeopardy provision would be construed consistently with Michigan precedent and the Fifth Amendment.' "[22] Although state constitutional provisions can provide greater protections than similar provisions in the United States Constitution, this Court has *repeatedly* held that the ratifiers intended Article 1, § 15 of our 1963 Constitution to be interpreted in a manner consistent with the Fifth Amendment of the United States Constitution.

In 2004, in *People v Nutt*, "[w]e conclude[d] that in adopting art 1, § 15, the people of this state intended that our double jeopardy provision would be construed consistently with Michigan precedent and the Fifth Amendment."[23] Even before our 1963 Constitution was adopted, this Court "defined the *scope of our Constitution's double jeopardy*

---

[20] *Szalma*, 487 Mich at 715-716, quoting US Const, Am V (brackets and ellipsis in *Szalma*).

[21] Const 1963, art 1, § 15; see also *Szalma*, 487 Mich at 716 & n 12.

[22] *Szalma*, 487 Mich at 716, quoting *Nutt*, 469 Mich at 591. "Even before the people enacted the 1963 constitution, this Court determined that the Double Jeopardy Clause in previous Michigan constitutions existed coterminously with [the] Fifth Amendment's Double Jeopardy Clause." *Szalma*, 487 Mich at 716 n 13, citing *In re Ascher*, 130 Mich 540, 545; 90 NW 418 (1902) (stating that "the law of jeopardy is doubtless the same under both" the Michigan and United States Constitutions).

[23] *Nutt*, 469 Mich at 591.

*protection* by reference to the *scope of the protection provided by the Fifth Amendment.*"[24]

We explained that "it is clear that the ratifiers of our 1963 Constitution intended to continue to accord the same double jeopardy protection under art 1, § 15 that was provided by the Fifth Amendment . . . ."[25]  The *Nutt* Court, therefore, "return[ed] to this Court's longstanding practice—commensurate with federal double jeopardy law" by adopting the federal *Blockburger*[26] same-elements test.[27]

In determining our ratifiers' intent, the *Nutt* Court looked to the history of Article 1, § 15.  The Court explained that in our 1963 Constitution, the narrower language of the 1850 and 1908 double-jeopardy provisions was replaced with language similar to that of the original Constitution of 1835 and the Fifth Amendment.[28]  "[T]he critical inquiry in determining the meaning of our constitutional analogue of the federal Double Jeopardy Clause is the intent of the ratifiers in adopting our 1963 Constitution."[29]  And this Court's review determined that "at the time of the ratification of our 1963 Constitution, it had long been established that . . . our double jeopardy provision in prior constitutions was

---

[24] *Id*. at 581 (emphasis added).

[25] *Id*. at 596.

[26] *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932).

[27] *Nutt*, 469 Mich at 588.  The *Nutt* Court concluded that *People v White*, 390 Mich 245; 212 NW2d 222 (1973), which abandoned the federal "same elements" test, was wrongly decided and overturned it because the ratifiers of our 1963 Constitution intended that the words "same offense" in Article 1, § 15 be construed consistently with state and federal double-jeopardy jurisprudence.  *Nutt*, 469 Mich at 568, 575.

[28] *Id*. at 588.

[29] *Id*. at 594.

construed coterminously with the common law and, more specifically," with federal jurisprudence.[30]  We recognized that "the meaning ascribed to a federal constitutional provision by the United States Supreme Court is not dispositive, except to the extent that it appears—as we have explained that it does in the case of Const 1963, art 1, § 15—that the ratifiers of our Constitution *intended* that a provision be construed consistently with the corresponding federal provision."[31]

The *Nutt* Court looked to materials from the Constitutional Convention of 1961 to verify the intent of the ratifiers:[32]

> Constitutional Convention Committee Proposal Number 15 recommended that Const 1908, art 2, § 14 [the 1908 Constitution's double-jeopardy provision] be revised to mirror the language of the Fifth Amendment, with the deletion of the "archaic" words "of life and limb."  1 Official Record, Constitutional Convention 1961, pp 464-465, 540. Delegate Stevens explained that "[t]he Supreme Court of Michigan . . . has virtually held that [Const 1908, art 2, § 14] means the same thing as the provision in the federal constitution, and that is what we have put in . . . ." *Id*. at 539.  It was reported that the change was *not substantive* and that the judiciary committee wished simply to bring the text of the double jeopardy provision "in line with the law as it now stands in the state of Michigan" and "in line with the federal constitution."  *Id*. at 542, 543. . . .  Therefore, Delegate Stevens explained, the committee "want[ed] to make the constitution read the way the supreme court says it does read."  *Id*. at 542,

---

[30] *Id*. at 583.

[31] *Id*. at 594.

[32] When interpreting our state Constitution, this Court "must consider the circumstances leading to the adoption of the provision and the purpose sought to be accomplished." *Mothering Justice v Attorney General*, 515 Mich 328, 346; 29 NW3d 346 (2024), opinion clarified 515 Mich 920 (2024) (quotation marks and citation omitted).  "[T]his Court has observed that constitutional convention debates and the address to the people, though not controlling, are relevant" in determining the common understanding.  *Id*. at 346 (quotation marks and citation omitted).

9

544. Thus, it is clear that the drafters understood that they were making no change to the state of the law and that they wished merely to amend the Double Jeopardy Clause to conform to the *prior decisions of this Court*.

Of even greater significance to our analysis is the Address to the People,[33] 2 Official Record, Constitutional Convention, 1961, p 3355, accompanying Const 1963, art 1, § 15:

> This is a revision of Sec. 14, Article II, of the present constitution. The new language of the first sentence involves *the substitution of the double jeopardy provision from the U.S. Constitution* in place of the present provision which merely prohibits [sic] "acquittal on the merits." This is *more consistent with the actual practice of the courts in Michigan*.[34] [2 Official Record, p 3364.]

Thus, the ratifiers were advised that (1) the double jeopardy protection conferred by our 1963 Constitution would parallel that of the federal constitution, and (2) that the proposal was meant to bring our double jeopardy provision into conformity with what this Court had already determined it to mean.[35]

---

[33] Because the Address to the People "was distributed to Michigan citizens in advance of the ratification vote and . . . explained in everyday language what each provision of the proposed new Constitution was intended to accomplish," *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 323-324; 870 NW2d 275 (2015), it provides strong corroboration of the ratifiers' intent.

[34] That "actual practice" of this Court was to interpret Michigan and federal double-jeopardy protections coextensively, even under the distinct 1908 language. See, e.g., *People v Schepps*, 231 Mich 260, 267; 203 NW 882 (1925) ("[T]his court is now committed to the views [regarding Michigan's double-jeopardy protection] adopted by the Federal courts under the United States Constitution."); *People v Bigge*, 297 Mich 58, 64; 297 NW 70 (1941) ("This State is committed to the view upon the subject of former jeopardy adopted by the Federal courts under the Federal Constitution."); *Nutt*, 469 Mich at 581-582. Thus, the framers intended to adopt the federal text into the 1963 Michigan Constitution to reflect this Court's understanding of Michigan's protection as consistent with its federal counterpart.

[35] *Nutt*, 469 Mich at 589-590 (some alterations in *Nutt*). "Moreover, the people were advised in the Address to the People that the proposed double jeopardy provision was coterminous with the Fifth Amendment." *Id*. at 591-592.

We therefore concluded in *Nutt* that the ratifiers of our 1963 Constitution intended to afford Article 1, § 15, which "is essentially identical to its federal counterpart," the same protection as provided by the Fifth Amendment.[36]

In 2005, in *People v Davis*, we again acknowledged "that in adopting art 1, § 15, the people of this state intended that our double jeopardy provision would be construed consistently with Michigan precedent and the Fifth Amendment."[37]

Once again, in 2007, in *People v Smith*, we concluded "that in adopting Const 1963, art 1, § 15, the ratifiers of our constitution intended that our double-jeopardy provision be construed consistently with then-existing Michigan caselaw and with the interpretation given to the Fifth Amendment by federal courts at the time of ratification."[38]  The *Smith* Court explained that "[w]hen the people ratified Const 1963, art 1, § 15, they understood that the term 'same offense' would be construed as it always had been under Michigan caselaw on that point, i.e., in a manner consistent with the interpretation of the federal constitution."[39]  The *Smith* Court then discussed how in *Nutt*, the Court had overturned its

---

[36] *Id*. at 575, 596.

[37] *Davis*, 472 Mich at 161 (quotation marks and citation omitted).

[38] *Smith*, 478 Mich at 315.  At issue in *Smith* was whether the "same offense" phrase in Article 1, § 15 has the same meaning in the context of the "multiple punishments" strand of double-jeopardy jurisprudence as it does in the context of the "successive prosecutions" strand.  *Id*. at 304.

[39] *Id*. at 319.

11

prior decision in *People v White*[40] because it was inconsistent with the ratifiers' intent regarding our double-jeopardy jurisprudence:

> [A]t the time *People v Nutt* was decided, this Court's double jeopardy jurisprudence had become largely unmoored from its constitutional foundation. In *White* and its progeny, the Court had disregarded the ratifiers' understanding of the phrase "same offense," and instead implemented a definition of the term that was consistent with its own ideas of "public policy." However, in *Nutt*, we recognized that it was the *ratifiers'* policy choices, and not those of the judiciary, which must govern our interpretation of the constitution. When *White* adopted the "same transaction" test, it acted contrary to the expressed intentions of the ratifiers that Michigan's Double Jeopardy Clause be interpreted in a manner consistent with the federal constitution, in accord with our then-existing caselaw. Therefore, in order to implement the policy determinations of the people, we overruled *White* and reinstated the meaning of the phrase "same offense" as it was understood by the ratifiers.[41]

In 2008, in *People v Ream*, this Court yet again affirmed that "in adopting Const 1963, art 1, § 15, the ratifiers of our constitution intended our double-jeopardy provision to be construed consistently with the interpretation given to the Fifth Amendment by federal courts at the time of ratification."[42] Moreover, the "conclusion that the Michigan Constitution affords greater protection than the Fifth Amendment has no basis in the

---

[40] *White*, 390 Mich 245.

[41] *Smith*, 478 Mich at 321-322. Similarly to the *White* Court, the majority of this Court, in adopting the broader *Pool* test from Arizona, is acting "contrary to the expressed intentions of the ratifiers that Michigan's Double Jeopardy Clause be interpreted in a manner consistent with the federal constitution . . . ." See *id*.

[42] *Ream*, 481 Mich at 239.

12

language of Const 1963, art 1, § 15, the common understanding of that language by the ratifiers, or under Michigan caselaw as it existed at the time of ratification."[43]

Just recently, in 2022, this Court held that "[w]hile we are not bound to interpret our Constitution consistently with similar provisions of the United States Constitution, 'we have been persuaded in the past that interpretations of the Double Jeopardy Clause of the Fifth Amendment have accurately conveyed the meaning of Const 1963, art 1, § 15.' Therefore, our analysis is the same under each."[44]

The above precedent demonstrates that this Court has consistently and overwhelmingly held that Michigan's Double Jeopardy Clause is to be interpreted consistently with the federal Double Jeopardy Clause as a matter of original ratifier intent. In order for this Court to adopt a different standard than the federal *Kennedy* standard, it must overrule precedents such as *Nutt*, *Davis*, *Smith*, *Ream*, *Szalma*, and *Beck* and articulate a reason to do so. But there is absolutely no reason, let alone a compelling one, offered in the majority opinion.

### B. THE MAJORITY OPINION INCORRECTLY DISPENSES WITH THE "COMPELLING REASON" TEST

Historical practice has been to apply the Michigan double-jeopardy provision coterminously with the federal one.[45] Decoupling the interpretation of a Michigan

---

[43] *Id*. at 233.

[44] *Beck*, 510 Mich at 11 n 1 (citation omitted). A majority of today's Court was part of the *Beck* Court that once again affirmed that our double-jeopardy jurisprudence is to be interpreted consistently with its federal counterpart.

[45] *Nutt*, 469 Mich at 581-584.

constitutional provision from the corresponding federal provision is a major shift in our jurisprudence for which no basis has been established. Indeed, application of the test for whether a Michigan constitutional provision should be read to provide the same protection as its federal counterpart cuts entirely *against* broader protection here.

To analyze whether a Michigan constitutional provision should be interpreted more broadly than a parallel provision in the United States Constitution, the Court has considered whether there is a "compelling reason" to read the Michigan provision that way.[46] A "compelling reason" may be significant textual differences, historical factors, and longstanding Michigan precedent.[47] Here, none of those considerations support treating the state and federal constitutional protections differently. Considering the essentially identical text of the federal Double Jeopardy Clause and the Michigan clause, it is difficult to discern a textual basis for interpreting them differently. Compare US Const, Am V, cl 2 ("[No person shall] be subject for the same offence to be twice put in jeopardy of life or limb[.]") with Const 1963, art 1, § 15 ("No person shall be subject for the same offense to be twice put in jeopardy."). A parallel textual construction reflects the democratic will expressed through constitutional ratification. As for "longstanding Michigan precedent," the caselaw is firmly on the side of coterminous application.[48] And for the "historical

---

[46] *People v Collins*, 438 Mich 8, 28-29, 31; 475 NW2d 684 (1991).

[47] See *People v Bullock*, 440 Mich 15, 27-35 & n 8; 485 NW2d 866 (1992) (considering whether the Michigan Constitution's prohibition against "cruel *or* unusual punishment" provided greater protection than the Eighth Amendment's "cruel *and* unusual punishments" prohibition).

[48] See note 4.

factors" consideration, it is hard to see how that would favor defendant's position here, given that the ratifiers of our 1963 Constitution intended our Double Jeopardy Clause to provide the same protection as its federal counterpart.[49]

The majority opinion dispenses with the "compelling reason" test when choosing to interpret Const 1963, art 1, § 15 more broadly than its federal counterpart. Although the "compelling reason" language "should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law," the majority opinion fails to recognize that the " 'compelling reason' test is a convenient formulation of the overarching responsibility to find a principled basis in the history of our jurisprudence for the creation of new rights."[50] In order for this Court to "faithfully interpret our state charter 'consistently with our oath of office and our structure of constitutional federalism,' "[51] we need not defer to the United States Supreme Court's interpretation of the Fifth Amendment. However, the lack of textual differences, longstanding precedent from this Court, and historical factors demonstrate that it was the intention of the ratifiers of our 1963 Constitution for our Double Jeopardy Clause to be interpreted in a manner consistent with the federal Double Jeopardy Clause.

Because the ratifiers' intention is clear, there is no good reason, let alone a compelling one, to interpret Michigan's Double Jeopardy Clause differently than the

---

[49] *Nutt*, 469 Mich at 589-590, 596 ("[I]t is clear that the ratifiers of our 1963 Constitution intended to continue to accord the same double jeopardy protection under art 1, § 15 that was provided by the Fifth Amendment[.]").

[50] *Sitz*, 443 Mich at 758, 763.

[51] Quoting *People v Tanner*, 496 Mich 199, 223 n 16; 853 NW2d 653 (2014).

15

federal Double Jeopardy Clause. Today, the majority of this Court adopts Arizona's more defendant-friendly test, not because it is more in line with the ratifiers' intent than the federal test, but because the majority of this Court will do, as it has the past several terms, what it wants, when it wants, and how it wants. The majority's desire in this case is to "simply engraft onto" the Michigan Constitution "more 'enlightened' rights than the framers intended."[52] Such method of constitutional interpretation has never before been embraced by the Michigan Supreme Court.

## C. THE MAJORITY OPINION REJECTS THE INTENT OF THE RATIFIERS OF CONST 1963, ART, 1 § 15

The majority opinion acknowledges that "our interpretive North Star is the 'original meaning to the ratifiers, the people, at the time of ratification[.]' "[53] But this acknowledgment is mere lip service to traditional Michigan constitutional jurisprudence. Today's opinion fails to follow the clear intent of our ratifiers when it departs from the federal *Kennedy* standard.[54] In an attempt to justify the adoption of another state's standard for determining when retrial is barred after a mistrial predicated upon prosecutorial misconduct, the majority unsuccessfully argues that the ratifiers of our 1963 Constitution did not intend for all of our state double-jeopardy protections to mirror those provided by

---

[52] See *Sitz*, 443 Mich at 759.

[53] Quoting *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004).

[54] See *Nutt*, 569 Mich at 581-584, 590 (examining materials from the Constitutional Convention of 1961 that make clear "the ratifiers were advised that . . . the double jeopardy protection conferred by our 1963 Constitution would parallel that of the federal constitution"). The majority opinion erroneously states that "the plain text [of Article 1, § 15] and [our] pre-ratification caselaw are silent[.]" But as demonstrated above, this is a complete falsehood.

16

the federal Double Jeopardy Clause. The majority opinion quotes our prior caselaw that states that the ratifiers of Article 1, § 15 "intended that our double jeopardy provision be construed consistently with *then-existing* Michigan caselaw and with the interpretation given to the Fifth Amendment by federal courts *at the time of ratification*."[55] The majority opinion states that because the federal courts did not develop a clear standard for when retrial would be barred based on prosecutorial misconduct before the 1963 Constitution was adopted, we need not follow a double-jeopardy standard that the federal courts announced after the 1963 Constitution was adopted.[56] The majority opinion cherry-picks language from our caselaw in an attempt to alter its meaning and argue that the ratifiers intended for Michigan's Double Jeopardy Clause to be interpreted consistently with the federal Double Jeopardy Clause in some aspects, but not others.

The ratifiers did not have such narrow intent. The *Nutt* Court closely examined the ratifiers' intent by looking at the record of the Constitutional Convention of 1961: "Constitutional Convention Committee Proposal Number 15 recommended that Const 1908, art 2, § 14 be revised to mirror the language of the Fifth Amendment, with the deletion of the 'archaic' words 'of life and limb.' "[57] Moreover, Delegate Stevens

---

[55] *Smith*, 478 Mich at 315 (emphasis added). See also *Davis*, 472 Mich at 168 ("As noted in *Nutt*, the common understanding of the people at the time that our double jeopardy provision was ratified was that the provision would be construed consistently with the federal double jeopardy jurisprudence *that then existed*.") (emphasis added).

[56] According to the majority, "[t]he upshot of these cases is that when federal double-jeopardy jurisprudence offered a clear standard *at or before* the time that Article 1, § 15 was ratified, we presume that the ratifiers intended for that standard to apply under the Michigan Constitution."

[57] *Nutt*, 469 Mich at 589.

explained that our Double Jeopardy Clause language was being revised to be nearly identical to the federal Double Jeopardy Clause "to bring the text of the double jeopardy provision 'in line with the law as it now stands in the state of Michigan," which is to interpret our Double Jeopardy Clause consistently with its federal counterpart.[58] The majority opinion even acknowledges that, at the 1961 Constitutional Convention, a "delegate explained that '[t]he Supreme Court of Michigan . . . has virtually held that [Const 1908, art 2, § 14] *means the same thing as the provision in the federal constitution, which is what we have put in . . . .*' "[59] When describing the revisions being made to our Double Jeopardy Clause, the Address to the People quite literally says that " '[t]he new language of the first sentence involves *the substitution of the double jeopardy provision from the U.S. Constitution* in place of the present provision . . . .*' "[60] The *Nutt* Court recognized that "the people were advised in the Address to the People that the proposed double jeopardy provision was coterminous with the Fifth Amendment."[61]

Despite such obvious evidence of the ratifiers' intent to construe our Double Jeopardy Clause consistently with its federal counterpart, the majority takes out of context language from a few of the many relevant cases previously decided by this Court to reach its desired outcome. When we said the ratifiers of Article 1, § 15 "intended that our double

---

[58] *Id*.

[59] Quoting 1 Official Record, Constitutional Convention 1961, p 539 (emphasis added; ellipses in majority opinion).

[60] *Nutt*, 469 Mich at 590, quoting Address to the People, 2 Official Record, Constitutional Convention 1961, p 3364.

[61] *Nutt*, 469 Mich at 591-592.

18

jeopardy provision be construed consistently with *then-existing* Michigan caselaw and with the interpretation given to the Fifth Amendment by federal courts *at the time of ratification*,"[62] we were explaining that "then-existing Michigan caselaw" held that Michigan double-jeopardy jurisprudence is consistent with federal double-jeopardy jurisprudence.[63] The ratifiers nowhere required there to be existing "standards" for every plausible double-jeopardy issue when it ratified our 1963 Constitution, and the ratifiers intended our Double Jeopardy Clause to afford the people of Michigan the same protections afforded by the federal Double Jeopardy Clause. Further, the ratifiers intended that "the double jeopardy protection conferred by our 1963 Constitution would parallel that of the federal constitution" in all aspects.[64] While the different "strands" of the double-jeopardy inquiry may have developed in federal caselaw after 1963, this does not change the fact that our ratifiers, looking at almost identical language, concluded that the clause as a whole would be interpreted consistently with the federal counterpart.

Moreover, we have followed the ratifiers' intent in regard to this double-jeopardy standard post-ratification of our 1963 Constitution. As the majority opinion recognizes, it was not until the latter half of the twentieth century that the United States Supreme Court began recognizing for the first time that double-jeopardy principles may sometimes bar

---

[62] *Smith*, 478 Mich at 315 (emphasis added).

[63] *Nutt*, 469 Mich at 589 (looking at documents from the 1961 Constitutional Convention that explain that before the 1963 Constitution was ratified, this Court held that our Double Jeopardy Clause was to be interpreted "in line with the federal constitution") (quotation marks and citation omitted).

[64] *Id*. at 590.

19

retrial after the defense secures a mistrial predicated upon prosecutorial misconduct.[65]  And as the majority opinion states, "[i]n the wake of these cases, this Court recognized a similar standard" to the corresponding federal standard at that time.[66]  Then, when the *Kennedy* test was announced, "[w]e adopt[ed] the federal standard" a few years later in *Dawson*.[67]  The ratifiers of our 1963 Constitution have made clear that Article 1, § 15 is to be interpreted consistently with its federal counterpart, and we have followed that intent as this federal double-jeopardy standard has evolved until today.[68]

---

[65] See, for example, *United States v Jorn*, 400 US 470, 485 & n 12; 91 S Ct 547; 27 L Ed 2d 543 (1971); *United States v Dinitz*, 424 US 600, 611; 96 S Ct 1075; 47 L Ed 2d 267 (1976); *Kennedy*, 456 US at 679.

[66] In *People v Anderson*, 409 Mich 474, 485 & n 23; 295 NW2d 482 (1980), this Court relied on the federal *Jorn* standard, explaining that retrial is barred "when the defendant's motion is induced by bad-faith conduct of the prosecutor or judge."  Likewise, in *People v Benton*, 402 Mich 47, 63; 260 NW2d 77 (1977), we explained how the Court in *Dinitz* "observed a distinction between *sua sponte* mistrials and mistrials granted at the defendant's request, declaring that where the defendant requests the mistrial, retrials may be barred when the judge or prosecutor acted in bad faith."

[67] *Dawson*, 431 Mich at 236.

[68] The majority opinion states that my position is that "we are forever tied to United States Supreme Court double-jeopardy caselaw[.]"  That is incorrect.  Rather, we are bound by the intent of the ratifiers of the 1963 Constitution to interpret our Double Jeopardy Clause consistently with its federal counterpart unless there is a compelling reason to do otherwise. There are no textual differences, historical factors, or precedent to support now interpreting our Double Jeopardy Clause more broadly than the Fifth Amendment.  The policy preference of a majority of the membership of this Court is simply not a valid basis to expand the protections of the Michigan Constitution over and above the protection available under our federal Constitution.  Perhaps our Double Jeopardy Clause could provide broader protection than its federal counterpart if the text of Article 1, § 15 were properly amended to provide such protection, but the text of this provision of our Michigan Constitution has not changed since it was ratified in 1963.

## D.  THE MAJORITY OPINION LOOKS TO OTHER STATES TO JUSTIFY ITS UNWARRANTED DEPARTURE

A majority of this Court sets aside the clear intent of the ratifiers of our 1963 Constitution and the consistent precedent from this Court.  In doing so, the majority is persuaded by a minority of other jurisdictions that have held that their state double-jeopardy protections are broader than those provided by the Fifth Amendment.[69]  It should not need to be said that the manner in which other jurisdictions interpret their state constitutions has no bearing on our interpretation of the Michigan Constitution.

The majority opinion states that although Arizona "would typically interpret its state double-jeopardy clause 'in conformity to the interpretation given by the United States Supreme Court to the same clause in the federal constitution,' the court declined to do so in the context of mistrials resulting from improper prosecutorial conduct."[70]  The majority uses Arizona's departure from the federal *Kennedy* test as its justification to do the same in this case.  Arizona's double-jeopardy jurisprudence, however, is much different than Michigan's double-jeopardy jurisprudence.  When Arizona chose to reject the federal *Kennedy* test, it was not bound by decades of Arizona Supreme Court precedent that held

---

[69] See Note, *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct: A Call for Broader State Protections*, 122 Colum L Rev 173, 188 (2022) (explaining that a "majority of state courts have adopted the *Kennedy* standard under their state constitutions. . . . [T]he highest courts in thirty-four states have followed *Kennedy* since the Supreme Court adopted the standard, while seven states have adopted standards that protect defendants in cases of prosecutorial misconduct more broadly than *Kennedy*.").  Nebraska is among the majority of states that have adopted the *Kennedy* test.  Similarly to Michigan, Nebraska has consistently held that its double jeopardy clause provides no greater protection than its federal counterpart.  *State v Bedolla*, 298 Neb 736, 744; 905 NW2d 629 (2018) ("[W]e have consistently held that the Double Jeopardy Clause of the Nebraska Constitution provides no greater protection than that of the U.S. Constitution[.]").

[70] Quoting *Pool*, 139 Ariz at 108.

the Arizona Double Jeopardy Clause was to be interpreted consistently with its federal counterpart. Moreover, the ratifiers of Arizona's Constitution did not express a clear intent like the ratifiers of Michigan's 1963 Constitution, who intended that our state double-jeopardy protections would be consistent with federal double-jeopardy protections. So, the fact that the Arizona Supreme Court declined to follow the federal *Kennedy* test provides no sound basis for this Court to forgo the intent of our constitutional ratifiers for the purpose of adopting a more defendant-friendly double-jeopardy test.

A minority of other jurisdictions have criticized *Kennedy*'s "subjective intent" standard as being too difficult to satisfy and have consequently adopted their own standard.[71] When our Court of Appeals decided *Dawson*, it offered the same criticism.[72] But that Court's decision to adopt a different standard was premised on the notion that "state constitutions can provide greater protections than those afforded by the United States Constitution."[73] Although this is true, it does *not* mean that Michigan's Double Jeopardy Clause *does* provide greater protection than its federal counterpart.[74] And on appeal in *Dawson* and in the years since our Court of Appeals' decision in that case, this Court adopted the federal *Kennedy* standard[75] and has made clear that the ratifiers of Const 1963,

---

[71] See *Pool*, 139 Ariz at 105, 108.

[72] *People v Dawson*, 154 Mich App 260, 270, 272-273; 397 NW2d 277 (1986).

[73] *Id*. at 268.

[74] See *People v Pickens*, 446 Mich 298, 315; 521 NW2d 797 (1994) ("The question of state constitutional adjudication, however, is not whether this Court may interpret our constitution differently than the federal constitution, the issue is whether we must.").

[75] *Dawson*, 431 Mich at 236.

art 1, § 15 intended it to be interpreted consistently with its federal counterpart.[76]  In following our decades of caselaw and the clear intent of the ratifiers of our 1963 Constitution, we should uphold this Court's adoption of the *Kennedy* standard rather than adopt the standard used by the Arizona Supreme Court, which has no relation to the Michigan Constitution or Michigan's double-jeopardy jurisprudence.

### E.  THE MAJORITY OPINION ABANDONS *DAWSON* AND COUNTLESS OTHER DECISIONS WITHOUT CONDUCTING A STARE DECISIS ANALYSIS

This exact issue has been before this Court before.  Today, this Court overturns our holding in *Dawson*, where "[w]e adopt[ed] the federal standard,"[77] and our many decisions post-*Dawson* where this Court has held that Const 1963, art 1, § 15 is "essentially identical" to its federal counterpart and that our ratifiers intended it to be "construed consistently with the corresponding federal provision."[78]  In doing so, this Court fails to conduct a stare decisis analysis.

The mere fact that a case is subsequently found to have been wrongly decided, by itself, does not necessarily mean that overruling it is appropriate.[79]  Rather, stare decisis is "generally 'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and

---

[76] See note 4.

[77] *Dawson*, 431 Mich at 236.

[78] *Nutt*, 489 Mich at 575, 594; see also *Beck*, 510 Mich at 11 n 1; *Szalma*, 487 Mich at 716; *Ream*, 481 Mich at 233; *Smith*, 478 Mich at 321-322; *Davis*, 472 Mich at 161.

[79] *Robinson v Detroit*, 462 Mich 439, 465; 613 NW2d 307 (2000).

contributes to the actual and perceived integrity of the judicial process.' "[80]   Indeed,

"principles of law deliberately examined and decided by a court of competent jurisdiction

should not be lightly departed."[81]   At the same time, "stare decisis is not to be applied

mechanically to forever prevent the Court from overruling earlier erroneous

decisions . . . ."[82]  Instead, we must acknowledge that "stare decisis is a principle of policy

rather than an inexorable command, and that the Court is not constrained to follow

precedent when governing decisions are unworkable or are badly reasoned."[83]

Accordingly, this Court has set forth the following factors pertinent to the stare decisis

analysis:

> (1) "whether the rule has proven to be intolerable because it defies practical
> workability"; (2) "whether reliance on the rule is such that overruling it
> would cause a special hardship and inequity"; (3) "whether upholding the
> rule is likely to result in serious detriment prejudicial to public interests"; and
> (4) "whether the prior decision was an abrupt and largely unexplained
> departure from precedent."[84]

In addition, it is appropriate to ask "whether changes in the law or facts no longer justify

the decision."[85]

---

[80] *Id*. at 463, quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998).

[81] *City of Coldwater v Consumers Energy Co*, 500 Mich 158, 172; 895 NW2d 154 (2017) (quotation marks and citation omitted).

[82] *Robinson*, 462 Mich at 463.

[83] *Id*. at 464 (quotation marks and citations omitted).

[84] *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 369; 792 NW2d 686 (2010) (citation omitted).

[85] *Coldwater*, 500 Mich at 173, citing *Robinson*, 462 Mich at 464.

The majority opinion fails to conduct a stare decisis analysis in overturning *Dawson*. The majority of this Court concludes that it is not bound by our holding in *Dawson* where we adopted the federal standard because, at oral argument before this Court, the prosecutor in *Dawson* conceded that the trial prosecutor's conduct was improper under the *Kennedy* standard.[86] Although the prosecutor made this concession, we nonetheless chose to "adopt the federal [*Kennedy*] standard."[87] *Dawson* is undeniably binding precedent from this Court, the overturning of which requires a stare decisis analysis. Thus, I find this Court's willingness to overturn our precedent in *Dawson* without even conducting such an analysis a disconcerting exercise of raw judicial power.

What is even more concerning is the majority's ease in overturning decades of this Court's post-*Dawson* caselaw in which this Court has made it clear that the *ratifiers* of Const 1963, art 1, § 15 *intended* it to be interpreted consistently with its federal counterpart. Today, this Court effectively overturns precedent, including *Beck*, *Szalma*, *Ream*, *Smith*, *Davis*, and *Nutt*,[88] without conducting a stare decisis analysis. A stare decisis analysis would show that these decisions should not be overturned. The majority opinion has not proven that the *Kennedy* standard, which we adopted almost 40 years ago, is unworkable or that upholding *Kennedy* as the proper test under our state Constitution is likely to result

---

[86] *Dawson*, 431 Mich at 236, 256-257.

[87] *Id*. at 236.

[88] *Nutt*, 469 Mich at 596; *Beck*, 510 Mich at 11 n 1; *Szalma*, 487 Mich at 716; *Ream*, 481 Mich at 233; *Smith*, 478 Mich at 321-322; *Davis*, 472 Mich at 161.

in serious detriment prejudicial to the public interest.[89]  Today's decision to adopt a test

from Arizona is an "abrupt and largely unexplained departure from [our] precedent."[90]  It

is clear that the majority simply prefers the more defendant-friendly *Pool* test and will not

or cannot explain how its preference justifies overruling decades of our caselaw.

## F.  IT IS UNNECESSARY TO DECIDE THE CORRECT STANDARD IN THIS CASE BECAUSE NEITHER *KENNEDY* NOR *POOL* IS SATISFIED

As discussed above, there are many reasons why this Court should not abandon

*Kennedy* and adopt *Pool* as the new test in our state.  Moreover, this case is not an ideal

vehicle to abandon *Kennedy* and adopt *Pool* because neither standard is met to bar

defendant from being retried.[91]

The majority opinion remands to the trial court to determine whether retrial is

permissible in this case under the Arizona *Pool* standard.[92]  The Arizona *Pool* standard

uses a three-prong test, which states that double jeopardy bars retrial where:

---

[89] Just because the test may be difficult for a defendant to satisfy does not make it unworkable.

[90] *Lansing Sch Ed Ass'n*, 487 Mich at 369 (quotation marks and citation omitted).

[91] Previously, this Court has declined to adopt a new standard when it has concluded that neither the previous nor the new standard would be met.  *People v Tyson*, 423 Mich 357, 372; 377 NW2d 738 (1985) ("We find it unnecessary to decide at this time whether Michigan should adopt the pre-*Kennedy* or the *Kennedy* standard of prosecutorial error, because we find that the prosecutor's error in this case was insufficient to meet either standard.").

[92] The majority opinion states that it declines to apply the *Pool* standard because "the factual record is insufficient to determine whether defendant's retrial violated Article 1, § 15, under the standard we announce today.  The trial court did not, for instance, make any findings on whether the prosecutor engaged in 'intentional conduct which the prosecutor kn[ew] to be improper and prejudicial, and which he pursue[d] for any improper

1. Mistrial is granted because of improper conduct or actions by the prosecutor; and

2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to ***intentional conduct*** *which the prosecutor knows*[9] *to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal*; and

3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

---

[9] The trial judge is to measure what the prosecutor "intends" and "knows" by objective factors, *which include the situation in which the prosecutor found himself*, the evidence of actual knowledge and intent and any other factors which may give rise to an appropriate inference or conclusion. *He may also consider the prosecutor's own explanations* of his "knowledge" and "intent" to the extent that such explanation can be given credence in light of the minimum requirements expected of all lawyers.[93]

---

purpose with indifference to a significant resulting danger of mistrial or reversal[.]' " Quoting *Pool*, 139 Ariz at 108-109 (brackets in majority opinion).

I disagree that the factual record is insufficient, and so did the Court of Appeals. The prosecutor explained that he "was trying to argue for [a] conviction to get the jury to find [defendant] guilty, not for a mistrial." The trial court then stated that "when the defense doesn't even object during the course of the testimony or in argument as to that, I can hardly find that the prosecution actually intended to somehow elicit this mistrial when the foundation was laid during testimony." And the court also looked at whether the behavior of the prosecution, "through their conduct or misconduct, . . . was so egregious that it actually contemplated or brought about the mistrial in an intentional fashion." It concluded that "[t]here is nothing in the record to suggest that's the case, and in fact, I'm not even sure that we would have a mistrial motion brought before this Court if this Court did not highlight the fact that the prosecution had overstepped their bounds."

[93] *Pool*, 139 Ariz at 108-109 (emphasis added).

Curiously, the majority opinion fails to mention that the Court of Appeals already determined that neither *Kennedy* nor the more defendant-friendly *Pool* test is satisfied in this case:

> The instant case differs from *Dawson* in several respects. Here, the prosecutor did not concede that he intended to cause a mistrial. To the contrary, the prosecutor stated that his statements were designed "to get the jury to find [defendant] guilty, not for a mistrial." At most, this evidences a concession of recklessness, not a specific intent to cause a mistrial. In response, the trial court ruled that nothing in the record suggested that the prosecutor engaged in conduct so egregious as to suggest an intent to bring about a mistrial. In *Dawson*, our Supreme Court declined to apply the *Pool* test, choosing to go no further than the *Kennedy* test. But regardless of which test is applied, the primary consideration in both is whether the prosecutor's actions evince an *intent* to cause a mistrial. And since we must rely in large part on the trial court's assessment of the prosecutor's behavior, we conclude that the trial court did not clearly err in finding that the prosecutor did not intend to goad the defense into requesting a mistrial. The objective facts presented here do not contradict the prosecutor's denial that he intended to provoke a mistrial, and the record indicates that the prosecutor's error was the result of recklessness, negligence, or a lack of skill rather than an intentional effort to goad the defense into requesting a mistrial in this relatively straight-forward case. Accordingly, we find that double-jeopardy principles did not bar retrial.[94]

The Court of Appeals majority also responded to the Court of Appeals dissent, explaining that even if the Court were to adopt the Arizona *Pool* standard as advocated for by Judge SHAPIRO, the fact remains that both tests require a showing of intent; even the *Pool* test requires the trial court to evaluate " 'what the prosecutor "intends" and "knows" by objective factors.' "[95] The majority could not understand how Judge SHAPIRO could conclude that *Pool* was satisfied here, given that the prosecutor expressly stated that he did

---

[94] *Jennings*, unpub op at 4.

[95] *Id*. at 4 n 2, quoting *Pool*, 139 Ariz at 108 n 9.

28

not intend to cause a mistrial, and the trial court believed him. Because there was little evidence to support the conclusion that defendant could meet the *Kennedy* or *Pool* standards, the majority saw no need to determine which test should apply.

The Court of Appeals was correct in concluding that it is unnecessary in this case to address the precise legal standard for whether double jeopardy applies. Whatever the standard—*Kennedy* or *Pool*—there needs to be *intent* by the prosecutor to do something that the prosecutor "knows to be improper and prejudicial" and is motivated by "any improper purpose with indifference" to the risks of mistrial or reversal.[96] Although the prosecutor here later admitted his error, it would be difficult to find that he knew his conduct was improper and prejudicial based on the objective evidence set forth in the record. While the prosecutor's closing argument certainly crossed a line, he did not appear to realize it until the trial court raised the issue sua sponte. Even then, he had to confirm with his office's appellate specialist that he had indeed committed reversible error. And the objective evidence shows that the prosecutor did not engage in intentional improper conduct with indifference toward causing a mistrial. After all, the prosecutor opposed mistrial, arguing against it repeatedly. The prosecutor explained that his statements as to defendant's silence were designed "to get the jury to find him guilty, not for a mistrial."[97] The trial court agreed, finding that "[t]here is nothing in the record to suggest that's the case, and in fact, I'm not even sure that we would have a mistrial motion brought before

---

[96] See *Pool*, 139 Ariz at 108-109. The majority opinion declined defendant's request to adopt a standard that does not require intentional misconduct of any kind.

[97] The *Pool* Court made clear that the trial court shall consider the prosecutor's own explanations of his knowledge and intent. *Pool*, 139 Ariz at 108 n 9.

this Court if this Court did not highlight the fact that the prosecution had overstepped their bounds." Other than speculation about the prosecutor's motives, there appears to be nothing to counter the trial court's finding on this point, much less evidence that could show the trial court to have clearly erred.[98]

Moreover, unlike in *Dawson*, where "[t]he prosecutor's case was going badly,"[99] the procession of the trial here strongly suggests that the prosecutor would have no incentive to act egregiously enough to risk a mistrial. At defendant's second trial, the prosecution secured a conviction by presenting essentially the same evidence and witnesses as at the first trial. At both trials, a witness testified that she saw a man fire a gun, and she described the outfit the shooter was wearing and what car he was driving. The officer who initiated the traffic stop of defendant testified that within a few minutes of being dispatched, he saw the suspect car and, after pulling it over, he saw a man that matched the witness's description of the shooter. Given the strength of the evidence in the record prior to the prosecutor's improper statement, it would be hard to believe that the prosecutor purposely committed misconduct. Without some plausible incentive to cause a mistrial, it is difficult to see why there would be intent to do so. Even under the Arizona *Pool* standard, it is hard to discern objective evidence of the prosecutor's intent to cause a mistrial or knowledge that he was likely to do so.

The strength of the prosecutor's case, the isolated nature of the error, the lack of any objection by defense counsel, and the trial court's factual findings—reversible only when

---

[98] See *Dawson*, 431 Mich at 258.

[99] *Id*.

clearly erroneous—mean that no matter which standard is applied, affirmance is required. Factor two of *Pool* requires "intentional conduct" that the prosecutor "knows to be improper and prejudicial" and is motivated by "any improper purpose" with "indifference" to the risks of mistrial or reversal. The record and the trial court's factual findings do not permit the conclusion that the prosecutor knew his conduct to be improper and prejudicial or that he was motivated by "any improper purpose." The prosecutor's conduct may demonstrate negligence or mistake, but it does not demonstrate the requisite level of intent under either *Pool* or *Kennedy*. Thus, defendant is not entitled to relief under any formulation of the applicable test, making this case a less-than-ideal vehicle to rehaul our double-jeopardy jurisprudence. Perhaps because of this, the majority opinion fails to meaningfully engage with the developed facts.

## IV. CONCLUSION

Today, a majority of this Court acts without judicial restraint in setting aside both decades of our Court's caselaw and the intent of the ratifiers of Const 1963, art 1, § 15 in holding that our Double Jeopardy Clause provides broader protection than the federal Double Jeopardy Clause. *Kennedy*, the federal test we adopted in *Dawson*, effectuates the intent of our ratifiers who "intended to continue to accord the same double jeopardy protection under art 1, § 15 that was provided by the Fifth Amendment[.]"[100] The "conclusion that the Michigan Constitution affords greater protection than the Fifth Amendment has no basis in the language of Const 1963, art 1, § 15, the common understanding of the language by the ratifiers, or under Michigan caselaw as it then existed

_____

[100] *Nutt*, 469 Mich at 596.

31

at the time of ratification."[101]  Adopting a broader standard used by the Arizona Supreme Court under its state constitution does not effectuate our ratifiers' intent.  I would affirm the judgment of the Court of Appeals, as the panel's majority correctly held that defendant is not entitled to relief under either the *Kennedy* or *Pool* standards.  For the foregoing reasons, I dissent.

Brian K. Zahra
Richard H. Bernstein

---

[101] *Smith*, 478 Mich at 314; see also *Ream*, 481 Mich at 233.